**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARTIN MARCEAU; CANDICE
LAMOTT; JULIE RATTLER; JOSEPH
RATTLER, JR.; JOHN G. EDWARDS;
MARY J. GRANT; GRAY GRANT;
DEANA MOUNTAIN CHIEF, on behalf
of themselves and others similarly
situated,
          *Plaintiffs-Appellants,*

v.

BLACKFEET HOUSING AUTHORITY,
and its board members; SANDRA
CALFBOSSRIBS; NEVA RUNNING
WOLF; KELLY EDWARDS; URSULA
SPOTTED BEAR; MELVIN MARTINEZ,
Secretary; DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
United States of America,
          *Defendants-Appellees.*

No. 04-35210

D.C. No.
CV-02-00073-SEH

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
June 16, 2005—Seattle, Washington

Filed July 21, 2006

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Pregerson;
Concurrence by Judge Pregerson

8071

## COUNSEL

Jeff Simkovic, (argued and briefed), Billings, Montana, Thomas E. Towe, (briefed), Towe, Ball, Enright, Mackey & Sommerfeld, Billings, Montana, and Mary Ann Sutton (argued and briefed), Missoula, Montana, for the plaintiffs-appellants.

Timothy J. Cavan, Assistant United States Attorney, Department of HUD, Billings, Montana, Stephen A. Doherty for

Blackfeet Housing, Great Falls, Montana, and Harold J. Rennett for Government, Washington, D.C., for the defendants-appellees.

---

## OPINION

PREGERSON, Circuit Judge:

Plaintiffs represent members of the Blackfeet Indian tribe who purchased or leased homes built under the auspices of the Department of Housing and Urban Development ("HUD") Mutual Help and Homeownership Program ("MHHO Program"). Plaintiffs' homes were built with wood foundations, using wood pressure-treated with arsenic and other toxic chemicals. Plaintiffs allege that this use of wood foundations caused their homes to deteriorate, and that the present condition of the homes has caused and continues to cause severe health problems for the homes' residents. They sued both HUD and the Blackfeet Tribal Housing Authority ("Housing Authority") and its board members alleging numerous statutory and contractual violations. We have jurisdiction under 28 U.S.C. § 1291, with the limitations discussed below. We reverse the district court's dismissal of the claims against the Housing Authority, and affirm dismissal of the claims against HUD.

### I.   Factual Background[1]

Pursuant to the goals set out in the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1440 (2005), HUD developed the MHHO Program. The MHHO Program was designed to

---

[1]These facts, except as noted, are taken from Plaintiffs' complaint, which is presumed true for purposes of this Rule 12(b)(6) proceeding. For a more vivid description of the Plaintiffs' plight, see Jessie McQuillan, *Rotten Deal*, Missoula Indep., April 6, 2006, *available at* http://www.missoulanews.com/News/News.asp?no=5625.

meet the housing needs of low-income American Indian families. HUD entered into agreements called "Annual Contributions Contracts" with tribal housing authorities under which HUD agreed to provide a specified amount of money to fund projects undertaken by the housing authorities and pre-approved by HUD. *See* 24 C.F.R. § 805.102 (1979); *id.* § 805.206. After securing funding from HUD, the Housing Authority, in turn, would contract with eligible American Indian families. *See id.* § 805.406. The families were required to contribute land, labor, or materials to the building of their house, *see id.* § 805.408, and after occupying the house, each family was required to make monthly payments in an amount calibrated to their income, *see id.* § 805.416(a)(1)(ii). The homebuyers were made responsible for maintenance of the house. *See id*. § 805.418(a). Until 1988, when the program was formalized in the Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), *repealed by* Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016 (1996), HUD operated the MHHO Program under a series of regulations and its own "Indian Housing Handbook." *See* H.R. Rep. No. 100-604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 793.

In 1977, the Blackfeet Tribe established a separate entity, the Blackfeet Housing Authority, as required by HUD's regulations. *See* 24 C.F.R. § 805.109(c) (1979) (requiring, as a prerequisite to receiving MHHO funding, that tribes form a tribal housing authority). The Blackfeet Tribe adopted HUD's model enabling ordinance, *reprinted in* 24 C.F.R. § 805, subpt. A, app. I (1979).[2] In the enabling ordinance, the Blackfeet Housing Authority was charged with "[a]lleviating the acute shortage of decent, safe and sanitary dwellings for persons of low income" and "[r]emedying unsafe and

---

[2]The Board of the Blackfeet Housing Authority has since been disbanded, and the entity is now simply an arm of the tribal government called "Blackfeet Housing." This fact makes no difference to our analysis, and we use "Housing Authority" to refer to this entity in both its iterations.

[u]nsanitary housing conditions that are injurious to the public health, safety and morals." Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977). Thereafter, HUD granted the Housing Authority authorization and funding to build 153 homes.

Construction of the homes took place between 1979 and 1980. The homes, at least in retrospect, were not constructed well. The homes were built with wood foundations, and the wood products used to build the foundations were chemically treated with arsenic and other toxic chemicals. Plaintiffs allege, as the crux of their claim, that HUD *required* the use of wood foundations over the objection of tribal members, and that the Housing Authority acceded to that directive.

In the ensuing years, the foundations were, predictably, vulnerable to moisture accumulation and structural instability. Today, some of the houses are uninhabitable due to toxic mold and dried sewage residues. There has been a high incidence of cancer, asthma, kidney failure, respiratory problems, and other serious health problems among residents of the homes. Many residents have been advised to leave their houses for health reasons; some residents cannot leave because there are, quite simply, no affordable housing options in the area.

Plaintiffs represent those who purchased or leased these MHHO homes either directly or indirectly from the Housing Authority. They have made significant monthly payments and investments of their own time and/or resources, as required under the MHHO program. After it became clear that the houses were substandard and possibly hazardous, Plaintiffs sought assistance from the Housing Authority and from HUD in remedying the construction defects. When they received no assistance from either entity, Plaintiffs filed this class action complaint on August 2, 2002, in the District Court for the District of Montana seeking declaratory and injunctive relief and damages. They named, as Defendants, the Housing

Authority, its board members, and Mel Martinez, then-secretary of the Department of Housing and Urban Development. Plaintiffs allege that HUD and the Blackfeet Housing Authority violated statutory, contractual, and fiduciary duties owed to them.

HUD Defendants filed a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Tribal Defendants filed a similar motion to dismiss based on tribal immunity. After hearings and further briefing, the district court granted both parties' motions to dismiss. Plaintiffs appealed.

## II.   Standard of Review

We review the question of subject matter jurisdiction *de novo*. *See Coyle v. P.T. Garuda Indon.*, 363 F.3d 979, 984 n.7 (9th Cir. 2004). Questions of tribal and sovereign immunity are also reviewed *de novo*. *See Orff v. United States*, 358 F.3d 1137, 1142 (9th Cir. 2004); *Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 492 (9th Cir. 2002). Dismissal for failure to state a claim is likewise reviewed *de novo*. *See Decker v. Advantage Funding, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004).

## III.   Analysis

### A.   *Tribal Immunity for Board Members of the Blackfeet Housing Authority*

**[1]** An Indian tribe enjoys sovereign immunity from suit except where Congress authorizes the suit or the tribe waives its immunity. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). Tribal immunity extends to both the corporate and governmental activities of the tribe. *See id.* at 754-55. It extends to agencies and subdivisions of the tribe, and has generally been held to apply to housing authorities

formed by tribes. *See, e.g., Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583 (8th Cir. 1998). Moreover, tribal immunity covers "tribal officials when acting in their official capacity and within their scope of authority." *United States v. Oregon*, 657 F.2d 1009, 1013 n.8 (9th Cir. 1981). Thus there is little doubt that the Blackfeet Tribe's sovereign immunity extends to the Blackfeet Housing Authority and to the members of the Blackfeet Housing Authority's board.

**[2]** We turn next to the question of waiver. Congressional abrogation of tribal immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (citation omitted). Similarly, a tribe may voluntarily subject itself to suit by issuing a "clear" waiver. *See C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001).

Plaintiffs claim that a "sue and be sued" clause in the Enabling Ordinance that created the Blackfeet Housing Authority is a clear waiver of tribal immunity. The Enabling Ordinance states:

> The Council hereby gives its irrevocable consent to allowing the Authority to sue and be sued in its corporate name, upon any contract, claim or obligation arising out of its activities under this ordinance and hereby authorizes the Authority to agree by contract to waive any immunity from suit which it might otherwise have; but the Tribe shall not be liable for the debts or obligations of the Authority.

Blackfeet Tribal Ordinance No. 7, art. V, § 2 (Jan. 4, 1977). For the reasons set forth below, we conclude that the "sue and be sued" clause of the Enabling Ordinance is a clear and unambiguous waiver of tribal immunity, and we reverse the district court's dismissal of the claims against the Housing Authority.

### 1. Caselaw

**[3]** The federal courts have had frequent occasion to interpret this "sue and be sued" clause. The text was proposed in HUD's model enabling ordinance, and is repeated in the enabling ordinance of many tribal housing authorities. *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 30 (1st Cir. 2000) (commenting that "[d]ue to HUD's formulaic approach, several other decisions have dealt with substantially identical ordinances"). The courts have not, however, agreed in their interpretations. *See* Felix S. Cohen et al., *Cohen's Handbook of Federal Indian Law* § 4.04[3][a][ii] (2005) ("Some courts have held this language to be a waiver of the immunity of the tribal corporation, and others have not.").

**[4]** Two main lines of cases have emerged. First, there is a line of cases stating that the very existence of a "sue and be sued clause" waives the tribal immunity of housing authorities. In *Namekagon Development Co. v. Bois Forte Reservation Housing Authority*, 395 F. Supp. 23 (D. Minn. 1974), *aff'd*, 517 F.2d 508 (8th Cir. 1975), the district court held that a construction contractor could sue the Bois Forte Reservation Housing Authority over a contract claim. The court rested its decision on the similarity between the model ordinance's "sue and be sued" clause and the "sue and be sued" clause used by the federal government when it creates a corporation. *See id.* at 27. The court noted that federal corporations are not immune from suit unless expressly created to be immune from suit, but that in the case of tribal housing authorities, it did not need to go that far because the "sue and be sued" clause was a clear expression that the corporation itself had surrendered its sovereign immunity. *See id.* at 26-27. Moreover, the court stated that it would be "grossly unfair" to dismiss the suit against the housing authority, where the tribe had "purported to create an independent corporation which would be legally responsible for its promises . . . [and] invited

outsiders to do business with it on a contractual basis." *Id.* at 29.

Subsequent cases followed *Namekagon* without adding much more to the analysis. *See, e.g., Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.,* 797 F.2d 668, 671 (8th Cir. 1986); *Whitebird v. Kickapoo Hous. Auth.*, 751 F. Supp. 928, 929-30 (D. Kan. 1990); *Snowbird Constr. Co. v. United States*, 666 F. Supp. 1437, 1441 (D. Idaho 1987); *Duluth Lumber & Plywood Co. v. Delta Dev., Inc.*, 281 N.W.2d 377, 383-84 (Minn. 1979). The only authority in our circuit, *R.J. Williams Co. v. Fort Belknap Housing Authority*, 719 F.2d 979 (9th Cir. 1983), also tracks this line of cases. In *R.J. Williams Co.*, we noted, in dictum, that the tribal immunity of the Fort Belknap Housing Authority was waived by the "sue and be sued" clause in the ordinance establishing the Housing Authority. *See id.* at 982 n.2. Similarly, the Blackfeet Tribal Court of Appeals has followed *Namekagon* and has permitted a contractual suit against the Housing Authority. *See DeRoche v. Blackfeet Indian Hous. Auth.*, 17 Indian L. Rptr. 6036, 6042 (Blackfeet Trib. Ct. App. 1989) ("Contrary to the housing authority's position, this tribal ordinance is an indisputable qualified waiver of immunity by the Blackfeet Tribe and housing authority for a breach of contract action. . . . With [this] tribal ordinance, the tribe waived, to some extent, the housing authority's immunity from suit." (citing *Namekagon*, 517 F.2d at 510)); *see also Davis v. Turtle Mountain Hous. Auth.*, 17 Indian L. Rptr. 6035 (Turtle Mountain Trib. Ct. 1990) (allowing a suit for declaratory relief against the housing authority based on shoddy workmanship on a MHHO house: "The court refuses to 'force plaintiffs out into the street or into the bush' as the defense of tribal immunity would do. . . . If the defendants let contractors off with substandard work, the immunity defense will not save the housing authority from declaratory relief.").

**[5]** Another line of cases from the Eighth and Second Circuits diverges from *Namekagon.* The Eighth Circuit, in *Dillon*

*v. Yankton Sioux Housing Authority*, 144 F.3d 581 (8th Cir. 1998), held that the "sue and be sued" clause alone did not waive tribal immunity. The court relied heavily on its own opinion in *Weeks Construction* to support its decision, stating that, in *Weeks Construction* "and the cases cited therein," there was a contract that expressly waived sovereign immunity. *Id.* at 583-84. The court held that, because the employee who sued the Yankton Sioux Housing Authority had no contract for employment, the tribe retained its immunity from suit.

We believe that *Dillon* provides little support for the proposition that the "sue and be sued" clause is not sufficient to waive tribal immunity, because it misreads *Weeks Construction*. Although both *Weeks Construction* and *Namekagon* dealt with a contract dispute, neither court relied on any explicit waiver of immunity in the contract in reaching its decision that the housing authority had waived its sovereign immunity. *See Weeks Constr.*, 797 F.2d at 670 ("Weeks contends that federal jurisdiction over this action exists because the "sue and be sued" clause contained in the tribal ordinance chartering the Housing Authority represents a waiver of sovereign immunity. . . . The Housing Authority does not dispute that it is amenable to suit."); *Namekagon*, 395 F. Supp. at 27 ("The Court finds that one of the purposes of the Ordinance [that created the Housing Authority] was to cut the corporation off from the protection of sovereign immunity . . . ."). In fact, neither court even mentioned whether the contracts at issue *contained* any kind of explicit waiver. *Dillon*'s lack of citation on this point is thus conspicuous.[3] We refuse to compound this error by putting any stock in *Dillon*.

The Second Circuit went further when it held that the "sue

---

[3]Accordingly, the cases that rely on *Dillon* with little or no additional analysis are similarly flawed. *See, e.g., Ninigret,* 207 F.3d at 30; *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1047 (E.D. Wis. 1999).

and be sued" waiver was only a waiver in tribal courts, and did not confer any right on the federal courts to hear the case. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76 (2d Cir. 2001). In *Garcia*, the court based its analysis on a rule that a waiver of sovereign immunity by a foreign sovereign or a state sovereign waives immunity only in the courts of that sovereign. *See id.* at 87. Thus, the Second Circuit held that the "sue and be sued" clause waived sovereign immunity only in tribal courts. *Id.*

We believe that *Garcia*'s approach is also problematic. The *Namekagon* court specifically considered and rejected the proposition that a tribe's waiver of immunity waived immunity only in that tribe's courts. As the *Namekagon* court noted, there is no language in the enabling ordinance that limits the "sue and be sued" waiver to tribal courts. 395 F. Supp. at 28. To reach its holding in *Garcia*, then, the court was forced to read quite a bit into the clause.

Moreover, the *Garcia* court was probably wrong to do so, given that some tribes — including the St. Regis Mohawk Tribe that was at issue in *Garcia* — did not *have* a tribal court at the time they entered into the model ordinances creating the housing authority. *See Garcia*, 268 F.3d at 90 (Katzmann, J., concurring in part and concurring in the judgment). As Judge Katzmann wrote, "it is a little awkward to read the 'sue and be sued' ordinance . . . as a waiver of sovereign immunity only in (apparently yet-to-be-envisioned-or-created) Tribal Courts." *Id.* The Blackfeet Housing Authority has not asked us to go as far as the Second Circuit, nor given us any additional reasons that we should limit the "sue and be sued" clause to tribal courts, and we see no reason to do so.

> 2.  The Plain Meaning of the Housing Authority Enabling Ordinance

**[6]** Independent of the precedent on both sides, the plain meaning of the ordinance supports the approach taken in

*Namekagon.* First, the "sue and be sued" clause expressly permits suit on "any contract, claim or obligation arising out of its activities." Blackfeet Tribal Ordinance No. 7, art. V, § 2 (Jan. 4, 1977). This wording forecloses the argument that some further waiver must be obtained by a later contract; such a holding renders "claim or obligation" as surplusage. Moreover, the phrase "arising out of its activities" signals that the "sue and be sued" clause opens the door to liability that was not necessarily the product of negotiation, but rather liability that arose by virtue of the Housing Authority's conduct.

**[7]** Second, interpreting the "sue and be sued" clause as sufficient to waive the Housing Authority's immunity allows us to interpret the entire section consistently. The enabling ordinance has two clauses: (1) that the council "gives its irrevocable consent to allowing the Authority to sue and be sued in its corporate name"; and (2) that the council "authorizes the Authority to agree by contract to waive any immunity from suit which it might otherwise have." *Id.* The first clause clearly has some *present* effect. To give meaning to the first clause, we must interpret it to mean that the tribe waived the Housing Authority's immunity from suit, i.e., that no further tribal consent was required. Moreover, by doing so, we do not render the second clause — authorizing the Housing Authority to agree by contract to waive any immunity "it might otherwise have" — surplusage. Given the unclear nature of the tribe's right to waive its own authority at the time the ordinance was written, *see* Cohen, § 7.05[1][c], at 642, such clarification is not superfluous. *See Namekagon*, 395 F. Supp. at 27 (noting that the second clause "simply indicates a desire to make the corporation's amenability to suit unqualifiedly clear"). Thus, the language of the enabling ordinance supports the conclusion that the "sue and be sued" clause effected a waiver of the Housing Authority's tribal immunity.

**[8]** Third, Article VII, clause 7 of the Enabling Ordinance provides that "any judgment against the [Housing] Authority" shall not be a charge or lien against Blackfeet Housing's prop-

erty, but instead could be satisfied out of "its rents, fees or revenues." This section clearly countenances that the Housing Authority would be subject to a judgment against it, and only limits the *funds* out of which such a judgment could be satisfied.

**[9]** Thus a plain reading of the Blackfeet Housing Authority's enabling ordinance supports Plaintiffs' argument that the Blackfeet Housing Authority intended to waive its immunity when it enacted the enabling ordinance.

> 3. Additional Reasons for Adopting *Namekagon*'s Approach

**[10]** Moving away from the text of the ordinance, the context in which such housing authorities were created also informs the interpretation we give these clauses. In 1934, Congress passed the Indian Reorganization Act, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461-494), which permitted tribes to form corporate and quasi-corporate entities that could enter into and compete in the world of commerce. Tribes could ratify a constitution, write bylaws and otherwise organize "for its common welfare" under Section 16 of the Indian Reorganization Act. *See* 25 U.S.C. § 477. While performing sovereign acts, a tribe organized under Section 16 enjoyed immunity as a sovereign. *See, e.g., Linneen*, 276 F.3d at 493 ("The 'sue and be sued' clause in the Community's corporate charter in no way affects the sovereign immunity of the Community as a constitutional, or governmental, entity.").

**[11]** Under Section 17 of the Indian Reorganization Act, tribes were also permitted to form corporate organizations — business corporations through which they could enter the world of commerce. *See White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 866 n.17 (9th Cir. 1987). Housing authorities are Section 17 organizations. *See* Cohen, § 4.04[3][a], at 256 (citing housing authority cases in examples of Section 17 organizations). Housing authorities are

public corporations with enabling ordinances that resemble articles of incorporation, and contain a hierarchical structure similar to a board of directors. Charters for Section 17 organizations often contain "sue and be sued" clauses like the one at issue here. *See* Cohen, § 4.04[3][a], at 256. And, although the Housing Authority "occupies a role quintessentially related to self-governance," *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1080 (9th Cir. 2001), a tribal housing authority is nonetheless a "public corporation carrying on public enterprises," *see Eligibility of Indian Tribes for Loans and Grants under National Housing Act of 1937*, 57 Interior Dec. 145, 149, 1940 WL 4162, at *4 (Dep't of the Interior 1940).

**[12]** The designation of an entity as a Section 16 or a Section 17 organization affects how we interpret any waiver of immunity. This court has been careful to separate a tribe's corporate functions from its governmental functions. Accordingly, we have refused to read a waiver of immunity in the Section 17 corporate context as abrogating immunity for the tribe's governmental actions as a Section 16 entity. *See, e.g., Linneen*, 276 F.3d at 492. In the same way, however, a "sue and be sued" clause in the enabling ordinance of a Section 17 entity must be examined in light of the rationale of Section 17. The purpose of allowing tribes to create Section 17 corporations, even corporations that perform some quasi-governmental role, is to allow tribal entities to fully participate in the world of commerce. *See* 78 Cong. Rec. 11732 (1934) (noting that, in allowing tribes to incorporate under Section 17, Congress sought to promote the organization of tribal business enterprises and to enable those enterprises "to enter the white world on a footing of equal competition"). And:

> It is repugnant to the American theory of sovereignty that an instrumentality of the sovereign shall have all the rights and advantages of a trading corporation, and the ability to sue, and yet be itself immune from

suit, and able to contract with others, or to injure others, confident that no redress may be had against it as a matter of right.

*Namekagon*, 395 F. Supp. at 29 (citing *Fed. Sugar Ref. Co. v. U.S. Sugar Equalization Bd.*, 268 F. 575, 587 (S.D.N.Y. 1920)). Where there is an express waiver of tribal immunity, such as this "sue and be sued" clause, we should read that waiver in light of the purpose of Section 17. Because "developers and lenders will be reluctant to deal with a corporation which is legally irresponsible and cannot be made to answer for its debts," *id.* at 29, tribes can compete fully in the business world only if they voluntarily agree to limit their right to immunity.

Finally, the language of *Namekagon* that it is "grossly unjust" to interpret such a clear "sue and be sued" clause as anything less than a waiver of tribal immunity rings true here as well. The Housing Authority invited individuals to do business with it. It signed contracts with these Plaintiffs, bound the homeowners to make payments, and had contractual remedies in the event that Plaintiffs breached their promises. To interpret the "sue and be sued" clause in the manner suggested by the Housing Authority would render the Housing Authority's contractual obligations illusory.

**[13]** For these reasons, we hold that the Tribe waived the immunity of the Housing Authority when it enacted the enabling ordinance with its "sue and be sued" clause, subject to the limitations contained in the enabling ordinance. Of course, the enabling ordinance contains two important limitations on the Housing Authority's liability: (a) Article V, Cl. 2: the Tribe shall not be liable for the debts or obligations of the Authority; and (b) Article VII, Cl. 7: No judgment shall be a lien upon Authority property; judgments may only be enforced out of the Authority's rents, fees or revenues. Because a sovereign is entitled to set the terms on which it waives its immunity, such limits restrict the ability of Plain-

tiffs to collect damages against the Housing Authority. We remand Plaintiffs' claims against the Housing Authority to the district court for further proceedings.

B.   *Motion to Dismiss by the Secretary of the Department of Housing and Urban Development*

Plaintiffs appeal dismissal of the following claims against HUD: (a) a claim based on a violation of the trust responsibility; (b) a claim based on a violation of the Administrative Procedures Act; and (c) a claim for breach of contract. We affirm the district court's decision on each claim.

1.   Violation of Trust Responsibility and Fiduciary Duties

Plaintiffs allege that HUD has violated its trust responsibility to tribal members.[4] Plaintiffs' trust responsibility claims are based on the Mitchell Doctrine, which derives its origins from *United States v. Mitchell*, 445 U.S. 535 (1980) *("Mitchell I")* and *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"). These two cases concerned a suit by tribal members who lived on the Quinault Indian Reservation. The plaintiffs sued the Secretary of the Interior for damages based on alleged mismanagement of timber resources on land held in trust. In *Mitchell I*, 445 U.S. at 542, the Supreme Court found that the General Allotment Act, under which tribal land was taken into trust, created only a limited trust relationship between the United States and the tribal member as it related to timber management. The Court noted that the

---

[4]Count Three of Plaintiffs' original complaint alleged that HUD has violated: (a) the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1437x; (b) the Indian Housing Act, 42 U.S.C. §§ 1437aa-1437ee; (c) the Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. §§ 4101-4243; and (d) the Housing Act of 1949, 42 U.S.C. §§ 1441-1490. On appeal, Plaintiffs did not challenge the district court's holding that no express or implied right of action existed under those statutes. Accordingly, we do not consider those statutes here.

statute did not impose any responsibility for timber management on the federal government and left all beneficial use of the land in the allottee, not in the government. *See id.* at 542-55. The case was remanded to consider whether any other basis existed to find a full trust responsibility.

When the case returned to the Supreme Court, the Plaintiffs framed the trust responsibility on statutes that gave the Department of the Interior " 'comprehensive' control over the harvesting of Indian timber." *Mitchell II*, 463 U.S. at 209. This time, the Court found that the general trust relationship between the federal government and the tribal members culminated in full fiduciary responsibility because the Secretary of the Interior was granted statutory authority to exercise substantial control over the harvest of tribally-owned timber. Under the statute, the Secretary was required to consider " 'the needs and best interests of the Indian owner and his heirs.' " *Id.* at 209 (quoting 25 U.S.C. § 406(a)). Pursuant to this authority, the Secretary of the Interior promulgated regulations that addressed "virtually every aspect of forest management," essentially squeezing the tribe out of the opportunity to manage its own timber. *Id.* at 220. The Court concluded that this decision to take control of a tribally-owned resource and to manage it for the benefit of the tribe created fiduciary responsibilities, the breach of which mandated damages. *See id.* at 226.

**[14]** This pair of cases sets the stage for how we consider *Mitchell* claims: the general "ward-custodian" relationship between the federal government and the tribes does not give rise to fiduciary duties. But where the government takes full control of a tribally-owned resource and manages it to the exclusion of the tribe, a fiduciary relationship is created and the government bears responsibilities as a fiduciary.

HUD's control over the MHHO projects is certainly pervasive. HUD set minimum property standards for MHHO hous-

ing. *See* 24 C.F.R. § 805.212(a) (1979).[5] Although the Housing Authority initially designed the projects, HUD retained the authority to alter those designs. *See id.* § 805.212(b)-(c). The Housing Authority had to keep the cost of the houses they designed within a HUD-mandated "proto-type cost" for each area. *See id.* §§ 805.213(a), (c), 805.214(b). The Housing Authority was not permitted to enter any contract for materials or labor without HUD's approval. *See id.* § 805.211(a)-(b).

**[15]** There is a fatal flaw, however, in Plaintiffs' *Mitchell* claim. Plaintiffs rely solely on the general trust responsibility that exists between the federal government and American Indians. But fiduciary duties arise under *Mitchell* only where the federal government pervasively regulates a tribally-owned resource. Plaintiffs offered no argument as to why a grant of HUD funds should be considered a tribal resource or why the general trust responsibility between the federal government and American Indians was focused into specific fiduciary duties. To say that government funding, conditioned on the performance of certain acts and heavily regulated by a gov-ernment agency, is a tribal resource subject to *Mitchell* fidu-ciary duties is a step we are unwilling to take in the absence of precedent extending the doctrine that far. Because Plain-tiffs have not shown that HUD took a pervasive role in the management of a tribal resource, we hold that no *Mitchell* fiduciary duty existed.

Later congressional acts dealing with Indian Housing have not provided any additional concrete duties that would give rise to a claim against HUD. Under the Indian Housing Act of 1988 and the Native American Housing Assistance and Self-Determination Act of 1996, HUD was *permitted*, not required, to provide additional money to housing authorities

---

[5]These minimum property standards, incidentally, appear to permit the use of wood foundations such as those used in Plaintiffs' home. *See* 24 C.F.R. pt. 200, subpt. S, app. (1976).

for the repairs. *See* 25 U.S.C. § 4132(1)-(5). Moreover, maintenance duties lay exclusively with individual home owners. *See* 24 C.F.R. § 805.418(a)(1) (1979). Because the Indian Housing Act and the Native American Housing Assistance and Self-Determination Act of 1996 did not add to the management responsibilities of HUD, they do not alter our *Mitchell* analysis. Accordingly, on the claims presented to us, we conclude that no *Mitchell* fiduciary duty existed.

### 2.    Violation of the Administrative Procedure Act

**[16]** Plaintiffs alleged that they are entitled to relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-706. The APA grants a cause of action to persons injured by administrative action. *See* 5 U.S.C. § 702. A claim under the APA requires, *inter alia*, that the claimant seeks "relief other than money damages." *Id.*; *see also Bowen v. Massachusetts*, 487 U.S. 879, 895-902 (1988). Examination of the relief Plaintiffs sought does not stop at the parties' allegations. Instead, "the substance of the pleadings must prevail over their form." *Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 361 (5th Cir. 1987) (interpreting monetary damages under the Tucker Act). Our task, then, is to "discern the nature of the relief being sought and focus on the type of relief that will result from the action." *Id.* at 362.

In this case, although Plaintiffs nominally claim equitable and injunctive relief, the substance of their claim is that they are owed money damages from the federal government. As Plaintiffs admitted at oral argument, their purpose in seeking a declaratory judgment is that it would enable them to seek monetary damages in other fora. Under the APA, however, Plaintiffs cannot seek relief that is essentially the equivalent of monetary damages. *See id.* at 362 (finding that the plaintiffs were, in essence, seeking monetary relief where "money would 'flow from,' or be the 'natural consequence' of" a review of agency action); *Gray v. Rankin*, 721 F. Supp. 115, 119 (S.D. Miss. 1989) (noting that "a complaint seeks relief

other than money damages within the meaning of the Administrative Procedure Act only if the equitable relief sought has a 'significant prospective effect or considerable value apart from merely determining monetary liability of the government' ") (citations omitted); *cf. Bakersfield City Sch. Dist. of Kern County v. Boyer*, 610 F.2d 621, 628 (9th Cir. 1979) ("[I]t is firmly established that, where the real effort of the complaining party is to obtain money from the federal government, the exclusive jurisdiction of the court of claims over non-tort claims exceeding $10,000 cannot be evaded or avoided by framing a district court complaint to appear to seek only injunctive, mandatory or declaratory relief against government officials or the government itself.").

**[17]** Similarly, an injunction is not available to Plaintiffs in this case. Injunctions are generally not permissible unless a legal damages remedy would be insufficient. *See Cont'l Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1104 (9th Cir. 1994); Charles Wright et al., *Federal Practice and Procedure* § 2944 (2d ed. 1995). Here, money damages in an amount necessary to repair or rebuild Plaintiffs' home would be a sufficient remedy, and, therefore, an injunction is not an available remedy. Because Plaintiffs have no remedy apart from legal damages, a claim under the APA is not appropriate.

In the alternative, Plaintiffs have argued that their claims are permitted under *Bowen v. Massachusetts*, 487 U.S. 879 (1988). In *Bowen*, the Court noted that a claim under the APA is not precluded simply because a "judicial remedy may require one party to pay money to another." *Id.* at 893. Rather, the APA forbids claims based on "a sum of money used as compensatory relief . . . to substitute for a suffered loss." *Id.* at 895. A plaintiff can, however, bring a claim under the APA if the plaintiff seeks money as a "specific remed[y] . . . the very thing to which he was entitled." *Id.* (citing Dan B. Dobbs, *Handbook on the Law of Remedies* 135 (1973)). Thus, for example, a claim under the APA is appropriate where a statute entitles a claimant to a specific amount of money, and

an administrative agency wrongfully withholds that money from the claimant.

Plaintiffs in this case clearly seek compensatory damages, not money as a specific equitable remedy. Plaintiffs claim that they were harmed because HUD caused their houses to be constructed in a substandard manner. Plaintiffs want a sum of money that would redress a wrong caused to them — a legal damage, not an equitable one. Accordingly, their claims cannot be brought under the APA.

### 3.    Breach of Contract Claims

[18] Finally, the district court properly found that it was without jurisdiction to review Plaintiffs' breach of contract claims. The Tucker Act vests the Court of Federal Claims with exclusive jurisdiction for contract claims against the United States. *See* 28 U.S.C. § 1491(a)(1). The Little Tucker Act carves out a minor exception, creating concurrent jurisdiction in the district courts for contract claims against the United States not exceeding $10,000. *See* 28 U.S.C. § 1346(a)(2). While parties may waive their right to receive more than $10,000, *see United States v. Johnson*, 153 F.2d 846, 848 (9th Cir. 1946), Plaintiffs have not done so in this case. Thus, given that Plaintiffs seek monetary damages in excess of $10,000, the District Court correctly determined that it was without jurisdiction to hear Plaintiffs' contract claims against HUD.[6] We likewise, then, lack jurisdiction to review Plaintiffs' contract claims.

---

[6]Contrary to Plaintiffs' assertions, where a case falls under Tucker Act jurisdiction, federal question jurisdiction cannot serve as an alternative basis for jurisdiction. Plaintiffs cite a Seventh Circuit case holding that federal question jurisdiction can be an alternative basis for jurisdiction, *W. Sec. Co. v. Derwinski*, 937 F.2d 1276, 1280-81 (7th Cir. 1991), and indeed the circuits appear to be divided on this question. *Compare C.H. Sanders Co. v. BHAP Hous. Dev. Fund Co.*, 903 F.2d 114, 118-20 (2d Cir. 1990) (finding Tucker Act jurisdiction not exclusive, where there is federal ques-

### IV.   Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of claims against HUD. We REVERSE, however, the dismissal of Plaintiffs' claims against the Blackfeet Tribal Housing Authority, and REMAND for proceedings in accordance with this opinion. The parties shall bear their own costs on appeal.

---

PREGERSON, Circuit Judge, specially concurring:

I write separately to point out the manifest injustice of releasing the federal government from responsibility in this suit. The relationship between the federal government and the tribes has been one of promises carelessly made and callously broken. Here we see that in the area of tribal housing, as in so many other areas, we as a nation have ignored the collateral consequences of our conduct toward American Indians and have utterly failed to live up to our promises. We have a moral duty, if not a legal duty, to remedy the harm caused to these Plaintiffs.

---

tion jurisdiction and a waiver of sovereign immunity), *with A.E. Finley & Assoc. v. United States*, 898 F.2d 1165, 1167 (6th Cir. 1990) ("[I]f an action rests within the exclusive jurisdiction of the Claims Court under the Tucker Act . . . the district court does not have jurisdiction regardless of other possible statutory bases."). The Ninth Circuit has not squarely confronted the particular arguments raised in those two cases, but has generally held that Tucker Act jurisdiction is exclusive. *See, e.g., Skokomish Indian Tribe v. United States*, 410 F.3d 506, 511 (9th Cir. 2005) (en banc); *M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 840 (9th Cir. 2002); *Wilkins v. United States*, 279 F.3d 782, 785 (9th Cir. 2002). We see no reason to disturb that conclusion here. Because Tucker Act jurisdiction is exclusive, except where the Little Tucker Act provides concurrent district court jurisdiction, such claims are properly reviewed in the court of claims, not in the federal district courts.

Much tribally-owned land, including the land at issue here, is held in trust "indefinitely." 25 U.S.C. § 462. The decision to hold the land in trust was made, in part, to prevent tribes from unwisely alienating their land. As the Supreme Court noted: "[W]hen Congress enacted the General Allotment Act, it intended that the United States 'hold the land . . . in trust' not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but *simply because it wished to prevent alienation of the land* and to ensure that allottees would be immune from the state taxation." *See United States v. Mitchell*, 445 U.S. 535, 544 (1980) (emphasis added). In so doing, we promised to guard the tribes's property rights for a period of time, while they prepared to "cope on equal footing" with the "white man who might attempt to cheat him out of his newly acquired property." *See* 18 Cong. Rec. 190 (1886) (statement of Representative Skinner).

However admirable the government's motivations, the decision to take tribal land in trust had adverse consequences: by holding tribal land in trust and preventing alienation, the federal government prevented the tribe from developing its own private housing market. For example, in a recent publication, the United States Commission on Civil Rights reported that American Indians have consistently found it difficult to obtain mortgages on their land because the land is held in trust and therefore cannot be used as collateral. *See* U.S. Comm. on Civil Rights*, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country* 63, *available at* http://www.usccr.gov/pubs/na0703/na0204.pdf [hereinafter *A Quiet Crisis*]; *see also* H.R. Rep. 100-604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 795. Similarly, private housing developers have been deterred from entering tribal housing markets because the property, once developed, cannot be alienated. *See A Quiet Crisis,* at 63.

The federal government has exercised pervasive control over tribal land, and in so doing, has severely limited the

tribe's control over its own economic development. In fact, according to one House Report relating to the passage of the Indian Housing Act, HUD's Mutual Help and Homeownership Program was the "only reasonable source of housing in many reservations," *see* H.R. Rep. 100-604, *reprinted in* 1988 U.S.C.C.A.N. 791, 795, in part because the land was held in trust. That is, while the goal of the General Allotment Act was to prevent *unwise* alienation of the land, the result was to prevent *any* encumbrance of the land for the purpose of building or improving housing. The effect was to freeze out developers from entering the private tribal housing market, and to leave the tribes with no option but to wait for the federal government to provide safe, decent, and sanitary housing.

Congress has, in more recent years, recognized that the federal government's control over the land and its general trust relationship with the tribes creates a responsibility for the federal government to remedy the deplorable housing conditions on reservations. *See* Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. § 4101(2)-(5). NAHASDA recognizes that:

> [T]he Congress, through treaties, statutes, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take greater responsibility for their own economic condition; . . . [Moreover,] providing affordable homes in safe and healthy environments is an essential element in the special role of the United States in helping tribes and their members to improve their housing conditions and socioeconomic status.

25 U.S.C. § 4101(4)-(5).

As suggested in the findings under NAHASDA, the federal government's duty to remedy tribal housing conditions existed even before NAHASDA — it derives from treaties and the "general course of dealing" with tribes. During the process of forcing the tribes onto reservations, many tribes were explicitly promised housing in exchange for land cession. *See* Virginia Davis, *A Discovery of Sorts: Reexamining the Origins of the Federal Indian Housing Obligation*, 18 Harv. BlackLetter L.J. 211, 215-23 (2002). Others were promised money that was intended to "promote their civilization." *See id.* at 218-19; *see, e.g.*, *White Mountain Apache Tribe of Arizona v. United States*, 26 Cl. Ct. 446, 465, 466-67 (1992).[1] The Court of Claims has held that treaty language such as the "requisites to 'promote civilization' " includes a covenant to provide housing. Thus, the federal government has long promised that it would assist American Indian tribes in providing housing.

Later, when much of tribal land was taken into trust under the General Allotment Act, it was done with an eye toward ensuring that every American Indian had a "homestead of his own with assistance by the government to build houses and fences, and open farms." *See* Davis, 18 Harv. BlackLetter L.J. at 224 (quoting Comm'r of Indian Affairs, *Annual Report* iv-v (1885)). Henry Dawes, proponent of the General Allotment Act, stated that holding tribal land in trust as a means of "civilizing" the American Indian would not work unless housing was also provided: "If [the American Indian] starts wrong; if he comes upon the homestead and is left there with no house to put himself in . . . what is to become of him? He had better never have been put there." *See* Davis, 18 Harv. BlackLetter

---

[1]Indeed, the Blackfeet Indian signed such a treaty. Treaty with the Blackfoot Indians, art. X, October 17, 1855, 11 Stat. 727 ("The United States further agree to expend annually, for the benefit of the aforesaid tribes of the Blackfoot Nation, a sum not exceeding fifteen thousand dollars annually, for ten years, in establishing and instructing them in agricultural and mechanical pursuits, and in educating their children, and in any other respect promoting their civilization and Christianization.")

L.J. at 224 (quoting Henry Dawes, Defense of the Dawes Act (1887)). Once again, when the government took the land in trust, it committed itself to play a major role in housing the trust land's occupants.

We have failed miserably in this duty. For much too long, our nation simply ignored our responsibility to assist the tribes in building houses. In 1966, the Bureau of Indian Affairs estimated that 75% of houses on Indian reservations and in the territory of the Alaska Natives were substandard, and that two-thirds "were too run down even to merit improvement." *See A Quiet Crisis* at 52. And yet, despite the advances made in the general population with the passage of the United States Housing Act of 1937, the federal government did little to remedy the substandard housing conditions on the reservations.

When HUD finally decided to extend its aid to the tribes in the 1960s, *see* Susan J. Ferrell, *Indian Housing: The Fourth Decade*, 7 St. Thomas L. Rev. 445, 452-53 (1995), the chosen vehicle was the Mutual Help and Homeownership Program ("MHHO Program"), through which homes were to be "completed at the lowest possible cost." U.S. Dep't of Hous. & Urban Dev., Manual 7440.1: Interim Indian Housing Handbook 3-40 (1976). In HUD's zeal to save money, it forced Plaintiffs' families — and probably members of countless other tribes — to decide between rejecting HUD funding altogether or living in homes that were cheaply built, homes that tribal members knew would not withstand the Montana climate for any period of time. These Plaintiffs, understandably, chose to take what they could get. And, as a result, Plaintiffs now live in homes infested with black mold and other toxins, plagued with structural disintegration, and that have caused high incidence of kidney failure, cancer, headaches and bloody noses in the home's residents. Yet many Plaintiffs remain in MHHO housing because, in many cases, "it is the only housing they can afford." *See* Jessie McQuillan, *Rotten*

*Deal*, Missoula Indep., April 6, 2006, *available    at* http://www.missoulanews.com/News/News.asp?no=5625.

Even after this situation was brought to HUD's attention, the federal government refused to step in and remedy the harm. Before filing this suit, Plaintiffs tried unsuccessfully for years to obtain funding to repair their houses, but their pleas fell on deaf ears. As HUD's counsel stated at oral argument, despite HUD's present desire to try to settle the case, Congress has not allocated sufficient discretionary funding to allow HUD any latitude to alleviate this most grievous situation on the Blackfeet Reservation.

The lack of affordable housing alternatives and the federal government's callousness to Plaintiffs' suffering have condemned Plaintiffs to live in dangerous houses that are making them sick. Under the theories presented here, we cannot offer Plaintiffs any relief against HUD. But our nation's responsibility to the Blackfeet Tribe and its members is deeper than a legal responsibility; it is also a moral responsibility. If we are serious about this duty, the federal government should recognize the consequences of its actions. We as a nation should live up to the promises that we have made. We should come to the assistance of the men, women, and children who will continue to live in absolute squalor until we step in.