**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARTIN MARCEAU; CANDICE
LAMOTT; JULIE RATTLER; JOSEPH
RATTLER, JR.; JOHN G. EDWARDS;
MARY J. GRANT; GRAY GRANT;
DEANA MOUNTAIN CHIEF, on behalf
of themselves and others similarly
situated,
　　　　*Plaintiffs-Appellants,*

　　　　　　v.

BLACKFEET HOUSING AUTHORITY,
and its board members; SANDRA
CALFBOSSRIBS; NEVA RUNNING
WOLF; KELLY EDWARDS; URSULA
SPOTTED BEAR; MELVIN MARTINEZ,
Secretary; DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
United States of America,
　　　　*Defendants-Appellees.*

No. 04-35210

D.C. No.
CV-02-00073-SEH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted on Rehearing
May 9, 2007—Portland, Oregon

Filed August 22, 2008

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Pregerson

11393

## COUNSEL

Thomas E. Towe, Towe, Ball, Enright, Mackey & Sommerfeld, PLLP, Billings, Montana; Jeffrey A. Simkovic, Simkovic Law Firm, Billings, Montana; Mary Ann Sutton, Attorney at Law, Missoula, Montana, for the plaintiffs-appellants.

Stephen A. Doherty and Patrick L. Smith, Smith, Doherty & Belcourt, P.C., Great Falls, Montana; Timothy J. Cavan, Assistant U.S. Attorney, Billings, Montana, for the defendants-appellees.

John T. Harrison, Confederated Salish and Kootenai Tribes, Tribal Legal Department, Pablo, Montana; Patterson V. Joe, Patterson V. Joe, P.C., Flagstaff, Arizona, for the amici.

## ORDER

The opinion filed on July 21, 2006, slip op. 8071, and appearing at 455 F.3d 974 (9th Cir. 2006), is replaced in part and adopted in part, and the amended opinion filed on March 19, 2008, slip op. 2545, and appearing at 519 F.3d 838, is replaced in its entirety by the amended opinion filed concurrently with this order.

With this amended opinion, Judges Graber and Gould have voted to deny the Petition of the Federal Appellees for Panel Rehearing and Blackfeet Housing's Petition for Rehearing En banc. Judge Pregerson has voted to grant the petitions.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.

The petition for panel rehearing and the petition for rehearing en banc are DENIED. No further petitions for panel rehearing or petitions for rehearing en banc may be filed.

**OPINION**

GRABER, Circuit Judge:

Plaintiffs are members of the Blackfeet Indian Tribe who bought or leased houses built under the auspices of the United States Department of Housing and Urban Development ("HUD"). The houses had wooden foundations. The wood had been pressure-treated with toxic chemicals. Plaintiffs allege that the use of wooden foundations caused their houses to deteriorate and that the chemicals in the wood have caused, and continue to cause, health problems for those who live in the houses. On behalf of a class of persons similarly situated, Plaintiffs sued HUD, the Secretary of HUD, the Blackfeet Tribal Housing Authority and its board members ("the Housing Authority") under several theories. The district court dismissed the entire complaint under Federal Rule of Civil Procedure 12(b)(6).

On rehearing, we hold: (1) Plaintiffs must exhaust their tribal court remedies before bringing their claim against the Housing Authority; (2) the government did not undertake a trust responsibility toward Plaintiffs to construct houses or maintain or repair houses; and (3) Plaintiffs alleged sufficient facts to state claims against HUD under the Administrative Procedure Act ("APA"). We readopt our earlier opinion[1] with respect to Plaintiff's breach of contract claims. Accordingly, we affirm the district court's dismissal of the case except as to Plaintiffs' claims against the Housing Authority and its board members and Plaintiffs' claims under the APA. As to those claims, we reverse and remand for further proceedings.

---

[1]*Marceau v. Blackfeet Hous. Auth. (Marceau I)*, 455 F.3d 974 (9th Cir. 2006).

## FACTUAL AND PROCEDURAL BACKGROUND

Because the district court dismissed the complaint for failure to state a claim, we construe the facts from Plaintiffs' complaint, which we must deem to be true, in the light most favorable to them. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). But we "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

The Blackfeet Tribe is a federally recognized Indian tribe. In January 1977, the Tribe established a separate entity, the Blackfeet Housing Authority. *See* 24 C.F.R. § 805.109(c) (1977) (requiring, as a prerequisite to receiving a block grant from HUD, that a tribe form a HUD-approved tribal housing authority). The Blackfeet Tribe adopted HUD's model enabling ordinance. Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977), *reprinted in* 24 C.F.R. § 805, subpt. A, app. I (1977). Thereafter, HUD granted the Blackfeet Housing Authority authorization and funding to build 153 houses.

Construction of those houses, and some additional ones, began after the Housing Authority came into being in 1977. Construction was completed by 1980.[2] The houses—at least in retrospect—were not well constructed. They had wooden foundations, and the wood products used in the foundations were pressure-treated with toxic chemicals. The crux of Plaintiffs' complaint is that HUD directed the use of pressure-treated wooden foundations, over the objection of tribal members, and that the Housing Authority acceded to that directive.

In the ensuing years, the foundations became vulnerable to the accumulation of moisture, including both groundwater and septic flooding, and to structural instability. Some of the

---

[2]In the district court, Plaintiffs' counsel stated that most of the houses were completed in 1978 and 1979, with "some follow-up into 1980."

houses have become uninhabitable due to contamination from toxic mold and dried sewage residues. The residents of the houses have experienced health problems, including frequent nosebleeds, hoarseness, headaches, malaise, asthma, kidney failure, and cancer.

Plaintiffs bought or leased the houses, either directly or indirectly, from the Housing Authority. After it became clear that the houses were unsafe or uninhabitable, Plaintiffs asked the Housing Authority and HUD to repair the existing houses, provide them with new houses, or pay them enough money to repair the houses or acquire substitute housing. When they received no help from either entity, Plaintiffs filed this class action against the Housing Authority, HUD, and the Secretary of HUD. Plaintiffs seek declaratory and injunctive relief and damages for alleged violations of statutory, contractual, and fiduciary duties.

HUD filed a motion to dismiss for lack of subject matter jurisdiction and a motion to dismiss for failure to state a claim upon which relief can be granted. The Housing Authority and its board members filed a motion to dismiss because of tribal immunity. The district court granted those motions.

In our original opinion, we affirmed the dismissal of HUD and its Secretary, but reversed with respect to the Housing Authority. *Marceau v. Blackfeet Hous. Auth. (Marceau I)*, 455 F.3d 974 (9th Cir. 2006). We granted the Housing Authority's petition for rehearing and issued an amended opinion. *Marceau v. Blackfeet Hous. Auth. (Marceau II)*, 519 F.3d 838 (9th Cir. 2008). The Housing Authority and HUD filed separate petitions for review. We now issue this revised opinion.

## STANDARD OF REVIEW

We review de novo each of the issues in this case. *See Coyle v. P.T. Garuda Indon.*, 363 F.3d 979, 984 n.7 (9th Cir.

2004) (concerning federal subject matter jurisdiction); *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 946 (9th Cir. 2008) (concerning exhaustion of tribal court remedies).

## DISCUSSION

### A.   *Claim against the Housing Authority*

Plaintiffs allege that the Blackfeet Housing Authority breached the covenants of habitability, merchantability, and good faith and fair dealing by selling defective homes to Plaintiffs. We decline to reach the merits of this contract claim because Plaintiffs first must exhaust their tribal court remedies.

[1] Principles of comity require federal courts to dismiss or to abstain from deciding claims over which tribal court jurisdiction is "colorable," provided that there is no evidence of bad faith or harassment. *Atwood*, 513 F.3d at 948. Exhaustion of tribal remedies is "mandatory." *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1245 (9th Cir. 1991). The parties failed to raise this issue until after we issued our opinion. Nevertheless, "[a] district court has no discretion to relieve a litigant from the duty to exhaust tribal remedies prior to proceeding in federal court." *Allstate Indem. Co. v. Stump*, 191 F.3d 1071, 1073 (9th Cir.), *amended*, 197 F.3d 1031 (9th Cir. 1999). Although Plaintiffs' contract claim has not yet been brought in tribal court, "[t]he absence of any ongoing litigation over the same matter in tribal courts does not defeat the tribal exhaustion requirement." *Sharber v. Spirit Mountain Gaming Inc.*, 343 F.3d 974, 976 (9th Cir. 2003) (per curiam); *see also United States v. Plainbull*, 957 F.2d 724, 728 (9th Cir. 1992) (holding that exhaustion of tribal remedies is "required even in the absence of a pending tribal court action").

[2] Tribal court jurisdiction over the contract disputes here is unquestionably colorable: Plaintiffs are tribal members, Defendant Blackfeet Housing Authority is a tribal entity, and

at least some key events—construction of the homes, for instance—occurred on tribal lands. *See Stock W. Corp. v. Taylor*, 964 F.2d 912, 919 (9th Cir. 1992) (en banc) (holding that tribal court jurisdiction was colorable where a *non-tribe* member sued a tribe in a contract and tort dispute and the key events *may* have taken place on tribal lands). Because there is no evidence of bad faith or harassment, we hold that Plaintiffs must exhaust their tribal court remedies. Accordingly, we remand the case. Because of the lengthy course of this litigation, the district court should stay, rather than dismiss, the action against the Housing Authority while Plaintiffs exhaust their tribal court remedies. *See Allstate Indem. Co.*, 191 F.3d at 1076 (remanding with instructions to stay action while party exhausted tribal court remedies). *Cf. Atwood*, 513 F.3d at 948 (approving a district court's discretionary decision to dismiss a domestic relations action when tribal court proceedings were pending).

**[3]** In our earlier opinions, we declined to require Plaintiffs to exhaust their tribal court remedies. Instead, we held that the Blackfeet Tribe had waived tribal immunity through the enabling ordinance that established the Housing Authority. *Marceau II*, 519 F.3d at 842-44; *Marceau I*, 455 F.3d at 978-83; *see also Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) (noting that "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity"). Our doing so was in error, and we now vacate that holding and decline to reach the issue. Whether or not the Tribe waived tribal immunity, the tribal court must have the first opportunity to address all issues within its jurisdiction, including that one.

B.   *Claim of Federal Trust Responsibility*

Plaintiffs allege that HUD violated its trust responsibility to them, as tribal members, "because of [HUD's] comprehensive and pervasive control of the monies, the property, the standards for constructing the homes, the standards for providing

mortgages for the homes, [and] the standards for who qualifies to live in the homes." Plaintiffs further allege that "[t]he corpus of the trust agreement is found in the statutes" concerning Indian housing. Before examining those statutes, we will set out some governing principles for interpreting them.

1. *Governing Principles*

**[4]** In general, a trust relationship exists between the United States and Indian Nations. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). But that relationship does not always translate into a cause of action.[3] In a pair of cases from the 1980s, the Supreme Court gave us guidance to determine when an actionable fiduciary duty toward Indians arises.

In *Mitchell I*, 445 U.S. at 541-46, tribal members on the Quinault Indian Reservation protested federal mismanagement of the tribe's timber resources. Although acknowledging that the Indian General Allotment Act of 1887 ("General Allotment Act"), ch. 119, 24 Stat. 388, 25 U.S.C. §§ 331-358 (1976) (§§ 331-333 *repealed by* Pub. L. No. 106-462, § 106(a)(1) (2000)), established a trust relationship on behalf of Indians, the Court found that the relationship was "limited" and did not impose on the government a particular duty to manage timber resources. *Mitchell I*, 445 U.S. at 542. Instead, the federal government's trust responsibilities under the General Allotment Act were merely to prevent alienation of the land and to hold the land "immune from . . . state taxation." *Id.* at 544. Despite rejecting the tribe's claim under the Gen-

---

[3]A cognizable claim that rests on the federal government's trust obligation is enforceable through the Tucker Act, 28 U.S.C. § 1491, or the Indian Tucker Act, 28 U.S.C. § 1505. *United States v. Mitchell*, 445 U.S. 535, 538-39 (1980) (*Mitchell I*); *United States v. Mitchell*, 463 U.S. 206, 218, 226 (1983) (*Mitchell II*). A federal court's jurisdiction is identical whether conferred by the Tucker Act or the Indian Tucker Act. *See Mitchell I*, 445 U.S. at 538-39. As a result, for convenience and unless otherwise noted, we refer to both the Indian Tucker Act and the Tucker Act as "the Tucker Act" in this opinion.

eral Allotment Act, the Court remanded the case to the Court of Claims to consider whether other statutes might provide a basis for liability. *Id.* at 546.

When the case returned to it, the Supreme Court permitted a claim to proceed. *Mitchell II*, 463 U.S. 206. The Court examined various timber management statutes that Congress had enacted after the General Allotment Act. *Id.* at 219-23. Those statutes directed the government to manage Indian forest resources, obtain revenue thereby, and pay proceeds to the Indian landowners. *Id.* The Court held that those statutes imposed strict and detailed duties on the government to manage forest lands. *Id.* at 224-25. In view of the pervasive and complete control exercised by the government over the lands, the statutes confirmed the existence of a fiduciary relationship. *Id.* Thus, the statutes satisfied the requirements for a claim of breach of fiduciary duty because they mandated the payment to Indians of money resulting from the management of Indian timber resources. *Id.* at 224-27.

**[5]** Together, *Mitchell I* and *Mitchell II* form the *Mitchell* doctrine: To create an actionable fiduciary duty of the federal government toward Indian tribes, a statute must give the government pervasive control over the resource at issue. Two 2003 Supreme Court decisions illustrate how the *Mitchell* doctrine applies: *United States v. Navajo Nation*, 537 U.S. 488 (2003), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

We first address *Navajo Nation*. In 1964, the Navajo Nation—with approval from the Secretary of the Interior—entered into a lease with the corporate predecessor of the Peabody Coal Company for the mining of coal on tribal lands. 537 U.S. at 493. The lease provided for low royalty payments to the tribe. *Id.* at 495. Under the terms of the lease, the tribe and the mining company agreed to delegate power to the Secretary of the Interior to adjust the royalty rate to a "reasonable" level on the twentieth anniversary of the lease. *Id.* By

the 1980s, the royalties to the Navajo Nation equaled only about 2% of gross proceeds of the coal, while Congress had established a yield of 12.5% for coal mined on federal lands. *Id.* at 495-96.

Eventually, the Navajo Nation and Peabody negotiated a change in the royalty rate to 12.5%, retroactive to 1984. *Id.* at 498. The agreement also included other concessions by Peabody, including acceptance of tribal taxation of coal production. *Id.* at 498-99. In 1987, after the Navajo Tribal Council approved amendments to the lease and a final agreement was signed, the Secretary of the Interior approved the agreement. *Id.* at 500.

The tribe later learned that the Secretary had engaged in ex parte dealings with Peabody, without which, they alleged, the rate could have been as high as 20%. The Navajo Nation filed suit in the Court of Federal Claims, claiming that the Secretary of the Interior had breached the government's trust obligations by approving the 1987 amendments to the lease. *Id.* at 500. The tribe contended that the Indian Mineral Leasing Act of 1938 ("Indian Mineral Leasing Act"), ch. 198, 52 Stat. 347, 25 U.S.C. §§ 396a-496g, imposed a fiduciary obligation on the Secretary of the Interior to maximize financial returns from coal leases on Indian lands and that the royalty approved in 1987 was inadequate. *Navajo Nation*, 537 U.S. at 493.

**[6]** When the case reached the Supreme Court, the Court confirmed the primacy of *Mitchell I* and *Mitchell II* as "the pathmarking precedents on the question whether a statute or regulation (or combination thereof) 'can fairly be interpreted as mandating compensation by the Federal Government.' " *Navajo Nation*, 537 U.S. at 503 (quoting *Mitchell II*, 463 U.S. at 218). The Court explained the contrast between *Mitchell I* and *Mitchell II* as the difference between a " 'bare trust' " for a limited purpose and " 'full responsibility' " for management of Indian resources. *Id.* at 505 (quoting *Mitchell II*, 463 U.S. at 224). The Court held that a court's analysis of a statute

"must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* at 506.

Turning to the Indian Mineral Leasing Act, the Court held that the statute failed to establish even the "limited trust relationship," which the Court found insufficient to support a claim for relief in *Mitchell I*, because the statute did not include any trust language. *Id.* at 507-08. Instead, the statute "simply require[d] Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective and authorize[d] the Secretary generally to promulgate regulations governing mining operations." *Id.* at 507 (citations omitted). Further, because the Indian Mineral Leasing Act "aim[ed] to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties," the congressional purpose would be defeated by "[i]mposing upon the Government a fiduciary duty to oversee the management of allotted lands." *Id.* at 508.

On the same day as it issued *Navajo Nation*, the Supreme Court examined the trust doctrine in the context of overseeing the maintenance of buildings on land of the White Mountain Apache Tribe. *White Mountain Apache Tribe*, 537 U.S. 465. In 1870, the United States Army established Fort Apache in the White Mountains of Arizona. *Id.* at 468. In the 1920s, control of the fort was transferred to the Department of the Interior, which used part of the property as a school. *Id.* at 468-69. In 1960, Congress declared that Fort Apache be " 'held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.' " *Id.* at 469 (quoting Pub. L. No. 86-392, 74 Stat. 8, 8 (1960 Act). In 1976, the National Park Service designated Fort Apache as a National Historic Site. *Id.*

The tribe brought suit, alleging that the Secretary of the Interior exercised the statutory prerogative to use the prop-

erty, but then failed to perform necessary maintenance and allowed Fort Apache to fall into disrepair. *White Mountain Apache Tribe v. United States*, 46 Fed. Cl. 20, 22 (1999). An engineering assessment estimated that rehabilitating the property in accordance with standards for historic preservation would cost $14 million. *White Mountain Apache Tribe*, 537 U.S. at 469.

The Supreme Court held that an actionable fiduciary relationship existed between the federal government and the tribe. *Id*. at 468. The Court explained that a trust relationship alone is not enough to imply a remedy in damages; "a further source of law [is] needed to provide focus for the trust relationship." *Id.* at 477. In the case of the White Mountain Apache Tribe, that further source of law was the 1960 Fort Apache statute, which went "beyond a bare trust and permit[ted] a fair inference that the Government [was] subject to duties as a trustee and liable in damages for breach." *Id.* at 474. First, the 1960 Act "expressly define[d] a fiduciary relationship" by providing that Fort Apache was " 'held by the United States *in trust* for the White Mountain Apache Tribe.' " *Id.* (quoting 74 Stat. at 8) (emphasis added). Second, the United States exercised its discretionary authority under the statute to make actual use of the property, "not merely exercis[ing] daily supervision but . . . enjoy[ing] daily occupation." *Id.* at 475. Because the government assumed plenary control over the assets held in trust, the government likewise assumed an obligation, as trustee, to preserve those assets. *Id.*

### 2.   *Housing on the Blackfeet Reservation*

To decide whether Plaintiffs have a viable claim for violation of a federal trust responsibility, we must examine the statutes and regulations pertaining to the Blackfeet houses at issue. After having done so, we conclude that HUD did not undertake a trust responsibility toward Plaintiffs to construct houses or to maintain or repair houses.

**[7]** During the period in which the houses were constructed, between 1977 and 1980, HUD provided federal funds to the Blackfeet Housing Authority pursuant to the United States Housing Act of 1937, 42 U.S.C. § 1437 (1976). Under that statute and its implementing regulations for Indian housing, a tribe could establish an Indian housing authority. 24 C.F.R. §§ 805.108, 805.109 (1977). In "Annual Contributions Contracts," HUD agreed to provide a specified amount of money to fund projects undertaken by an Indian housing authority and approved by HUD. *Id.* §§ 805.102, 805.206. After securing funding from HUD, an Indian housing authority contracted with eligible American Indian families. *Id.* § 805.406. Eligible families contributed land, labor, or materials to the building of their houses. *Id.* § 805.408. After occupying its house, each family made monthly payments to the housing authority in an amount calibrated to the family's income. *Id.* § 805.416(a)(1)(ii). The Indian purchasers were responsible for maintaining their houses. *Id.* § 805.418(a).

**[8]** The express intent of Congress was "to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs." 42 U.S.C. § 1437 (1976). In other words, Congress specifically intended that HUD *not* assume more responsibility in developing and managing housing projects than was necessary. HUD was not without legal obligations, however. Congress also provided:

> The Department of Housing and Urban Development . . . shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established, and in such manner as will encourage and assist (1) the production of housing of sound standards of design, construction, livability, and size for adequate family life; (2) the reduction of the

costs of housing without sacrifice of such sound standards; (3) the use of new designs, materials, techniques, and methods in residential construction, the use of standardized dimensions and methods of assembly of home-building materials and equipment, and the increase of efficiency in residential construction and maintenance; (4) the development of well-planned, integrated, residential neighborhoods and the development and redevelopment of communities; and (5) the stabilization of the housing industry at a high annual volume of residential construction.

42 U.S.C. § 1441. As we and our sister circuits have recognized, those goals create binding legal obligations on HUD. *Russell v. Landrieu*, 621 F.2d 1037, 1041 (9th Cir. 1980); *United States v. Winthrop Towers*, 628 F.2d 1028, 1034-36 (7th Cir. 1980); *Pennsylvania v. Lynn*, 501 F.2d 848, 855 (D.C. Cir. 1974); *see also Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 819-20 (3d Cir. 1970) (holding that plaintiff residents of HUD-administered homes could bring suit under the APA to challenge HUD actions allegedly not in accordance with the Housing Act). Those obligations apply to *all* HUD housing, however, and not just to housing constructed by Indian housing authorities.

Under its regulations, HUD had two general controls over Indian housing. First, HUD required that low-income housing meet Minimum Property Standards, 24 C.F.R. §§ 200.929, 805.212 (1977). Second, new construction could not exceed the "prototype costs" (HUD-approved ceiling or maximum costs for each type of dwelling) for a project, although the prototype costs could be revised upon request of a housing authority, either at application for a project or later when found to be necessary. 24 C.F.R. §§ 805.213(c), 805.214(b), 841.204 (1977).

Three important points bear emphasis. First, neither restriction was unique to Indian housing. Title 24 C.F.R. § 200.925

(1977) provided that *all* housing built under HUD programs, and not just housing built by Indian housing authorities, "shall meet or exceed HUD Minimum Property Standards." *See, e.g.*, 24 C.F.R. § 800.205(c)(1) (1977) (mandating that developers provide "detailed information" concerning the application of the Minimum Property Standards in their project applications); 24 C.F.R. § 841.107(c)(2) (1977) (requiring use of the Minimum Property Standards in other HUD-funded construction projects). Similarly, non-Indian housing construction projects had to comply with prototype cost limitations. *See, e.g.*, 24 C.F.R. §§ 841.115(b)(2), pt. 841, app. A (1977) (establishing limitations on dwelling construction and equipment costs based on the area prototype costs).

**[9]** Second, HUD regulations did not *require* the use of pressure-treated wooden foundations. With respect to foundations, HUD's Minimum Property Standards provided two alternative sets of minimum requirements, one for concrete or masonry walls below grade and one for pressure-treated wooden foundations. Dep't of Hous. & Urban Dev., *Handbook 4900.1: Minimum Property Standards for One and Two Family Dwellings* § 601-16 & app. E (1973 ed., rev. May 1979) ("*Minimum Property Standards Handbook*").

**[10]** Third, Indian housing authorities were not rigidly bound by either the Minimum Property Standards or the prototype cost limitations.[4] Indian housing authorities could choose to request variances from both the Minimum Property Standards and the prototype costs, if they believed that local conditions justified modifications. 24 C.F.R. §§ 805.212(a),

---

[4]Variances to the prototype cost limitations were likewise available to non-Indian housing authorities, but under somewhat different rules. 24 C.F.R. § 841.115(2) (1977). However, variances from HUD Minimum Property Standards generally were not available in non-Indian housing programs. *See* 24 C.F.R. § 841.107(c)(2) (1977) (mandating inclusion of HUD Minimum Property Standards as one of construction standards in design of public housing program projects); 24 C.F.R. § 883.208(a)(2) (1977) (requiring the same for Section 8 projects).

805.213(c) (1977). In a handbook published for use by Indian housing authorities, HUD characterized the introductory statements to the handbook on Minimum Property Standards as "stress[ing] the importance of flexibility to meet local conditions." Dep't of Hous. & Urban Dev., *Handbook 7440.1: Interim Indian Housing Handbook* § 3-5(a) (1976 ed., rev. Jan. 1978) ("*Indian Housing Handbook*"). As HUD emphasized:

> The [Indian Housing Authority] is responsible for the planning and development of Indian housing projects. The U.S. Housing Act of 1937 provides that local public housing agencies are to be vested with maximum responsibility for project administration and the Indian Self-Determination and Education Assistance Act emphasizes the importance of maximum Indian self-determination.

*Indian Housing Handbook* § 2-1(a).

Indeed, a 1979 amendment to the Indian housing regulations further emphasized the importance of maximizing Indian self-determination by removing the requirement that Indian housing comply with the HUD Minimum Property Standards in the absence of a waiver. Instead, the amendment required only that the design of Indian housing take into account the Minimum Property Standards, along with several other factors. 24 C.F.R. § 805.212(a) (1979). Thus, at the end of the period during which the housing in question was built, HUD was loosening, not tightening, the reins on the autonomy of Indian housing authorities that were receiving block grants.

By the time Plaintiffs filed their complaint in 2002, a new statutory regime was in effect under which Plaintiffs claim a federal trust obligation to repair or replace their houses.[5] In

---

[5]In 1988, Congress moved the authorization for Indian low-income housing to Title II of the United States Housing Act and formalized the

1996, Congress enacted the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 4101-4243. As the 1996 statute's statement of congressional findings recognized, federal Indian housing assistance was to be provided "in a manner that recognizes the right of Indian self-determination and tribal self-governance" and with the "goals of economic self-sufficiency and self-determination for tribes and their members." 25 U.S.C. § 4101(6)-(7).

Under NAHASDA, HUD makes annual block grants, in amounts determined by a formula, to a tribe or its designated housing entity (such as an Indian housing authority), to carry out activities related to the provision of affordable housing. 25 U.S.C. §§ 4111(a), 4152; 24 C.F.R. §§ 1000.201, 1000.202, 1000.206, 1000.301-.340. To receive a block grant, a tribe must submit to HUD an Indian Housing Plan that meets certain requirements and that is subject to HUD's approval. 25 U.S.C. § 4111(b); 24 C.F.R. § 1000.201. But the housing plan is to be "locally driven." 24 C.F.R. § 1000.220. And HUD's statutorily prescribed role—in addition, of course, to providing the block grants themselves—is generally confined to "a limited review of each Indian housing plan," and even then "only to the extent that [HUD] considers review is necessary." 25 U.S.C. § 4113(a)(1). The grant, once made, is subject to tribal control; the recipient, rather than HUD, is responsible for operating the housing program, including the continued maintenance of housing. 25 U.S.C. § 4133. HUD's responsibility consists primarily of oversight and audit, to ensure that federal funds are spent for the intended purpose. 24 C.F.R. § 1000.520.

---

Indian housing program. Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), *repealed by* Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016 ("NAHASDA"). The 1988 statute did not govern at the time the Blackfeet housing was built, nor does it govern presently. For our purposes, the 1988 statute does not affect the analysis.

Ultimately, no statute ever required tribes to form housing authorities. No statute obliged Indian housing authorities, once formed, to seek federal funds. No statute committed the United States itself to construct houses on Indian lands or to manage or repair them. Indeed, the relevant regulations expressly imposed inspection duties on Indian housing authorities, independently of HUD, including any enforcement of warranties. 24 C.F.R. §§ 805.221(a), 805.417(a) (1977).

No statute has imposed duties on the government to manage or maintain the property, as occurred in *Mitchell II*, nor has any HUD regulation done so. Unlike in *White Mountain Apache Tribe*, here no statute has declared that any of the property was to be held by the United States in trust, nor did the United States occupy or use any of the property. In the present case, there is plenary control of neither the money nor the property.

Instead, this case most closely resembles *Navajo Nation*. Just as the Indian Mineral Leasing Act required Secretarial approval of leases, but did not oblige the Secretary to negotiate them, the United States Housing Act gave HUD a right of final inspection with respect to construction and design materials, 24 C.F.R. §§ 805.211-805.217 (1977), but did not oblige HUD to select them. Here, as there, the statute failed to include a federal managerial role. Here, as there, Congress expressed the aim of giving the lead role to an entity other than the government.

Although we must take as true Plaintiffs' allegations that HUD in fact required the use of wooden foundations and that those foundations caused injury, the government did not enter into a trust relationship merely because HUD did not approve an alternative design. Although HUD's power to approve a design implies the power to reject a design as well, the Supreme Court made clear in *Mitchell I* and *Navajo Nation* that such oversight authority alone (whether exercised wisely

or unwisely) cannot create the legal relationship that is a threshold requirement for Plaintiffs to recover on a trust theory. Even if HUD's actions in mandating certain construction materials and methods may have been arbitrary or capricious, those actions alone cannot alter the legal relationship between the parties.

**[11]** In summary, under the Housing Act, Indian housing authorities (such as the Blackfeet Housing Authority) applied to HUD for loans to enable *the housing authority* to develop low-income public housing designed to be sold to eligible members of the tribe. Under NAHASDA, block grants could be used *by the tribe* or its designated housing entity to repair or replace housing. As with any grant of federal funds, certain requirements had to be met to obtain and spend the funds. But the federal government held no property—land, houses, money, or anything else—in trust. The federal government did not exercise direct control over Indian land, houses, or money by means of these funding mechanisms. The federal government did not build, manage, or maintain any of the housing. For these reasons, we adhere to our earlier ruling that the district court properly dismissed Plaintiffs' claim that HUD violated a trust responsibility. *Marceau I*, 455 F.3d at 983-85.

## C.   *Administrative Procedure Act*

Plaintiffs allege that they are entitled to relief under the APA, 5 U.S.C. §§ 702-706. The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. When reviewing an APA claim, a court may only (1) "compel agency action unlawfully withheld or unreasonably delayed"; or (2) "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)-(2)(A).

**[12]** In this case, the primary relief sought by Plaintiffs is an injunction ordering HUD to repair (or, where necessary, rebuild) their homes. The district court erred in dismissing Plaintiffs' APA claim before allowing adequate development of the record. Plaintiffs' claim rests on two separate legal obligations that give rise to cognizable claims under the APA.

First, as discussed above, the regulations in effect when HUD approved the 153 Blackfeet homes in the late 1970s required that housing materials meet specified Minimum Property Standards. 24 C.F.R. § 805.212 (1979); *Indian Housing Handbook* §§ 3-19, 3-20. The Minimum Property Standards permitted, but did not require, the use of chemically treated lumber in the foundations of single- and double-family dwellings. *See* 24 C.F.R. § 200.925 & pt. 200, subpt. S, app.; *see also Minimum Property Standards Handbook* app. E, pp. E-1 and E-2. According to the complaint, HUD *required* Plaintiffs, in violation of its regulations, to use wooden foundations and, further, to use arsenic-treated lumber.

Second, as discussed above, 42 U.S.C. § 1441 imposes binding legal obligations on HUD. Of importance here, HUD is required to "encourage and assist . . . the production of housing of sound standards of design, construction, livability, and size for adequate family life." *Id.* Plaintiffs allege that, by requiring the use of arsenic-treated lumber, HUD violated 42 U.S.C. § 1441.

**[13]** At this stage in the litigation, the record is silent about whether HUD failed to comply with its own regulations and whether arsenic-treated lumber was within industry standards at the time. We therefore reverse the dismissal of Plaintiffs' APA claim and remand to the district court for further factual development.[6]

---

[6]Plaintiffs also seek an injunction ordering HUD to respond to their repeated requests for assistance. In *Marceau II*, 519 F.3d at 851-52, we held that HUD was under a legal obligation to respond to those requests.

**[14]** Under the APA, a plaintiff must seek "relief other than money damages." 5 U.S.C. § 702. Previously, we held that "the substance of [Plaintiffs'] claim is that they are owed money damages." *Marceau I*, 455 F.3d at 985. On rehearing, we now hold that Plaintiffs' request for an injunction ordering HUD to repair or rebuild their homes is not a suit for "money damages," as that term is used in § 702.

**[15]** In *Marceau I*, we followed the Fifth Circuit's ruling in *Amoco Products Co. v. Hodel*, 815 F.2d 352 (5th Cir. 1987), and looked to whether an award of money damages could substitute for the requested injunction. *See Marceau I*, 455 F.3d at 985 ("Here, money damages in an amount necessary to repair or rebuild Plaintiffs' home[s] would be a sufficient remedy, and, therefore, an injunction is not an available remedy."). After *Amoco*, the Supreme Court emphasized that the correct inquiry is whether the plaintiff seeks compensatory relief or instead seeks specific relief; the former constitutes "money damages" but the latter does not. *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988); *see also Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) ("*Bowen* held that Congress employed this language ['money damages'] to distinguish between specific relief and compensatory, or substitute, relief."). At least one federal circuit court has recognized that *Amoco* is no longer good law. *Doe v. United States*, 372 F.3d 1308, 1313-14 (Fed. Cir. 2004); *see also Nat'l Ass'n of Counties v. Baker*, 842 F.2d 369, 373 (D.C. Cir. 1988) (rejecting the *Amoco* rule in a case that predated *Bowen*).

---

We relied on the obligations found in 24 C.F.R. § 905.270 (1977), and 25 U.S.C. §§ 4111 and 4132(1). On rehearing, we now hold that HUD had no legal obligation to respond to Plaintiffs' requests, sufficient to give rise to a claim under the APA. Read broadly, those regulations and statutes impose an obligation on HUD to respond to properly formed requests for assistance by *housing authorities*. They do not require HUD to respond to requests by *homeowners* such as Plaintiffs, and there is no evidence in the record of a properly formed request for assistance by the Blackfeet Housing Authority.

**[16]** Plaintiffs seek an injunction, which constitutes specific relief. The injunction sought by Plaintiffs seeks not to compensate, but to "give the plaintiff[s] the very thing to which [they] w[ere] entitled." *Bowen*, 487 U.S. at 895 (internal quotation marks omitted). We therefore conclude that this relief is not "money damages" under 5 U.S.C. § 706. *See Bowen*, 487 U.S. at 893 ("[I]nsofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages."); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) ("The remedy that [the plaintiff] seeks in its complaint is, at bottom, specific performance of the . . . [c]ontract. An action for specific performance is not an action for 'money damages' under APA § 702, even if the remedy may actually require a payment of money by the government."). Consequently, Plaintiffs' APA claim seeking injunctive relief is not barred.

## D.   *Breach of Contract Claims*

**[17]** We readopt our earlier opinion, *Marceau I*, 455 F.3d at 986, concerning Plaintiffs' breach of contract claims against HUD. The district court lacked jurisdiction to hear those claims, so there remains nothing for us to review.

AFFIRMED   in   part;   REVERSED   in   part   and REMANDED. The parties shall bear their own costs on appeal.

---

PREGERSON, Circuit Judge, dissenting:

I concur in the majority's rulings on exhaustion of tribal remedies and the Administrative Procedure Act. I dissent with regard to the majority's analysis of federal trust responsibility, and write separately on that issue.

## I.   Factual Background[1]

Pursuant to the goals set out in the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1440, HUD developed the Homeownership Program. HUD designed the Homeownership Program to meet the housing needs of low-income American Indian families. HUD entered into agreements called "Annual Contributions Contracts" with tribal housing authorities under which HUD agreed to provide a specified amount of money to fund projects undertaken by the housing authorities and pre-approved by HUD. *See* 24 C.F.R. § 805.102 (1979); *id.* § 805.206. After securing funding from HUD, a tribal housing authority would then contract with eligible American Indian families. *See id.* § 805.406. The program required families to contribute land, labor, or materials to the building of their house, *see id.* § 805.408, and after occupying the house, each family made monthly payments in an amount calibrated to their income, *see id.* § 805.416(a)(1)(ii). The homebuyers were responsible for maintenance of the house. *See id.* § 805.418(a).

Until 1988, when the program was formalized in the Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), *repealed by* Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016 (1996), HUD operated the Homeownership Program under a series of regulations and its "Indian Housing Handbook." *See* H.R. Rep. No. 100-604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 793.

In 1977, the Blackfeet Tribe established a separate entity, the Blackfeet Housing Authority, as HUD regulations required. *See* 24 C.F.R. § 805.109(c) (1979) (requiring, as a prerequisite to receiving Homeownership Program funding, that tribes form a tribal housing authority). HUD published a

---

[1]These facts, except as noted, are taken from Plaintiffs' complaint, which is presumed true for purposes of this Rule 12(b)(6) proceeding.

model enabling ordinance, *reprinted in* 24 C.F.R. § 805, subpt. A, app. I (1979), which the Blackfeet Tribe adopted. The enabling ordinance charged the Blackfeet Housing Authority with "[a]lleviating the acute shortage of decent, safe and sanitary dwellings for persons of low income" and "[r]emedying unsafe and [u]nsanitary housing conditions that are injurious to the public health, safety and morals." Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977). Thereafter, HUD granted the Housing Authority authorization and funding to build 153 homes.

Construction of the homes took place between 1979 and 1980. The homes, at least in retrospect, were not constructed well. The homes were built with wood foundations, and the wood products used to build the foundations were chemically treated with arsenic and other toxic chemicals. Plaintiffs allege, as the crux of their claim, that HUD *required* the use of wood foundations over the objection of tribal members, and that the Housing Authority acceded to that directive.

In the ensuing years, the foundations were, predictably, vulnerable to moisture accumulation and structural instability. Today, some of the houses are uninhabitable due to toxic mold and dried sewage residues. There has been a high incidence of cancer, asthma, kidney failure, respiratory problems, and other serious health problems among residents of the homes. Many residents have been advised to leave their houses for health reasons. Some residents, however, cannot leave because there are, quite simply, no affordable housing options in the area.

Plaintiffs purchased or leased these Homeownership Program homes either directly or indirectly from the Housing Authority. They made significant monthly payments and investments of their own time and/or resources, as required under the Homeownership Program. After it became clear that the houses were substandard and hazardous, Plaintiffs sought assistance from the Blackfeet Housing Authority and from

HUD in remedying the construction defects. When they received no assistance from either entity, Plaintiffs filed this class action complaint.

## II.   Analysis

### A.

Plaintiffs allege that HUD has violated its trust responsibility to tribal members.[2] The federal government has substantial trust responsibilities toward Indians. These duties are part of the nature of the government-Indian relationship. "[A] fiduciary relationship necessarily arises when the Government assumes . . . elaborate control over forests and property belonging to Indians." *United States v. Mitchell*, ("*Mitchell II*"), 463 U.S. 206, 225 (1983).

### 1.  *Historical Framework*

The federal government-Indian trust relationship dates back over a century. To appreciate the nature and extent of the government's responsibilities, and its failure to discharge them, I review the history of the government-Indian trust relationship.

The United States' relationship with the Indian tribes has almost always been "contentious and tragic." *Cobell v. Norton*, 240 F.3d 1081, 1087 (D.C. Cir. 2001). In the early days of this nation, the federal government sought to put an end to the communal living and nomadic life common to so many tribes. The government (by treaty and/or by force) moved

---

[2]Count Three of Plaintiffs' original complaint alleged that HUD has violated: (a) the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1437x; (b) the Indian Housing Act, 42 U.S.C. §§ 1437aa-1437ee; (c) the Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. §§ 4101-4243; and (d) the Housing Act of 1949, 42 U.S.C. §§ 1441-1490. On appeal, Plaintiffs did not challenge the district court's holding that no express or implied right of action existed under those statutes. Accordingly, I do not consider those statutes here.

Indians onto reservations. *See, e.g., Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831).

In the second half of the nineteenth century, the government replaced its policy of relocation with one of assimilation. This assimilationist policy began with treaties negotiated with individual tribes, and was eventually enacted into federal law with passage of the General Allotment Act of 1887, also known as the "Dawes Act," ch. 119, 24 Stat. 388 (as amended at 25 U.S.C. § 331 et seq.). Under the General Allotment Act, beneficial title of the lands allotted to tribes vested in the United States as trustee for individual Indians.[3]

The government then began to divide reservations and other Indian lands into individual parcels. The government essentially took the land it had earlier set aside for Indian tribes and re-allotted the land to individual tribe members. *See* Felix S. Cohen, Handbook of Federal Indian Law § 1.04 (2005 ed.). "The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force assimilation of Indians into the society at large." *Yakima v. Yakima Indian Nation*, 502 U.S. 251, 254,(1992). Once tribal lands were allotted in fee to individual tribal members, white settlers could purchase the lands from tribe members.

The federal government ceased allotting tribal lands to individuals with the enactment of the Indian Reorganization Act of 1934 ("IRA"), 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.). Lands already allotted remained so, but the IRA provided that unallotted Indian lands would be returned to tribal ownership. 25 U.S.C. § 463.

In the 1950s, federal Indian policy shifted yet again as Congress adopted a "termination policy." Under termination,

---

[3]Where tribes resisted allotment, it could be imposed. *See* Act of June 28, 1898, ch. 517, 30 Stat. 495 ("Curtis Act").

Congress sought to release tribes from federal supervision and to terminate the government-Indian relationship. The purpose of this policy shift was specifically to sever the trust relationship. *Cobell*, 240 F.3d at 1088. During this period, Congress terminated numbers of tribes and withdrew its recognition of those tribes.

The termination policy was no more successful than earlier assimilation efforts, and was soon replaced with the current policy of self-determination and self-governance. In 1975 Congress enacted the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203 (1975). Today, much tribally owned land is held in trust "indefinitely." 25 U.S.C. § 462.

### 2.   *The Mitchell Doctrine*

Here, Plaintiffs argue that, as tribal members, HUD owed them a trust duty and it breached that duty. Claims based on the tribal trust duty are enforceable via the Tucker Act. In 1980, the Supreme Court held that the General Allotment Act, on its own, did not provide a substantive damage remedy enforceable through the Tucker Act. *United States v. Mitchell* (*Mitchell I*), 445 U.S. 535, 541-46 (1980).

The tribe in *Mitchell I* protested federal mismanagement of its timber resources. Although acknowledging that the General Allotment Act did indeed establish a trust relationship on behalf of the Indians, the Court found the relationship to be a "limited" one that did not impose a duty to manage timber resources. *Id.* at 542. Under the Court's reading of the General Allotment Act, the trust responsibilities of the federal government under the statute were merely to prevent alienation of the land and to hold the land "immune from . . . state taxation." *Id.* at 544.

Although the *Mitchell I* Court rejected the tribe's claim as premised solely on the General Allotment Act, it remanded to

the Court of Claims for consideration of whether other statutes might provide a basis for liability. *Id.* at 546. Thus, the Court left the door open to continued pursuit of the claim against the federal government under alternative sources of law.

When the case returned to it, the Supreme Court permitted the Tucker Act suit to proceed. *Mitchell II*, 463 U.S. 206. The Court examined various timber management statutes enacted subsequent to the General Allotment Act, which directed the government to manage Indian forest resources, obtain revenue thereby, and pay proceeds to the landowners. *Id.* at 219-24. The Court held that these statutes imposed strict duties upon the government to manage forestlands and specifically required the government to take into account the maintenance of the productive use of the land, the highest and best use of the land, and the financial needs of the owner and the owner's heirs. *Id.* The Court held that the statutes confirmed the existence of a fiduciary relationship, especially given the pervasive and complete control exercised by the government over these lands. *Id.*

Finally, in *Mitchell II* the Court concluded that because this fiduciary relationship specifically prescribed management of Indian timber resources, these statutes could fairly be interpreted as mandating the payment of money — thereby satisfying the standard for a Tucker Act action. *Id.* at 224-27. Moreover, the Court stated, absent a damages remedy, the fiduciary obligations of the United States would be largely unenforceable, because prospective relief would be inadequate and fail to deter federal officials from defaulting in their trust duties. *Id.* at 227-28.

Together, *Mitchell I* and *II* form the *Mitchell* doctrine, which outlines the circumstances under which the federal government owes a fiduciary duty to tribes. These cases indicate that the government's obligation must go beyond the mere general obligation that it owes to domestic dependent

sovereigns. A tribe must demonstrate specific statutory language indicating that the federal government has pervasive control over the resource at issue. Two decisions from 2003 clarify the *Mitchell* doctrine: *United States v. Navajo Nation*, 537 U.S. 488 (2003), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

In 1964, the Navajo Nation, with the approval of the Secretary of the Interior, entered into a lease with the corporate predecessor of the Peabody Coal Company for coal mining on tribal lands. *Navajo Nation v. United States*, 46 Fed. Cl. 217, 221 (Ct. Cl. 2000). The lease provided for low initial royalty payments to the tribe. *Id.* Pursuant to the terms of the lease, the tribe and the mining company agreed to delegate power to the Secretary of the Interior to adjust the royalty rate to a "reasonable" level on the twentieth anniversary of the lease. *Id.* By the 1980s, the royalty payments to the Navajo Nation were only about two percent of gross proceeds on the coal, well below the twelve-and-a-half percent Congress had established for coal mined on federal lands. *Navajo Nation*, 537 U.S. at 496.

Subsequently, the Navajo Nation and the Peabody Mining Company negotiated a change in the royalty rate to twelve-and-a-half percent, retroactive to 1984, and included other concessions such as coal company acceptance of tribal taxation of coal production. *Id.* at 498. In 1987, after the Navajo Tribal Council approved the lease amendments and a final agreement was signed, Interior Secretary Hodel approved the negotiated agreement. *Id.* at 500. The tribe later learned that Secretary Hodel had engaged in backroom ex parte dealings with the coal company, without which the royalty rate would likely have been closer to twenty percent (not the twelve-and-a-half percent negotiated).

In 1993, the Navajo Nation filed suit in the Court of Federal Claims under both the Tucker Act and the Indian Tucker Act, claiming that the Secretary of the Interior breached the

government's trust obligations by approving the 1987 amendments to the lease. *Navajo Nation*, 46 Fed. Cl. at 220-21. The tribe contended that the Indian Mineral Leasing Act imposed a fiduciary obligation on the Secretary of the Interior to maximize the financial returns from coal leases and that the twelve-and-a-half percent royalty rate approved in 1987 was manifestly inadequate. *Id.* at 219-21.

In *Navajo Nation*, the Supreme Court confirmed the continued primacy of *Mitchell I* and *Mitchell II* as "the pathmarking precedents on the question whether a statute or regulation (or combination thereof) 'can fairly be interpreted as mandating compensation by the Federal Government.' " 537 U.S. at 503 (quoting *Mitchell II*, 463 U.S. at 218). The Court explained the contrast between *Mitchell I* and *Mitchell II* as that between a "bare trust" for limited purposes and "full responsibility" by the government for management of Indian resources. *Id.* at 505 (quoting *Mitchell II*, 463 U.S. at 224). The Court held that the statutory "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* at 506. However, once such a full fiduciary duty has been identified in the pertinent statute, the Court said that the availability of damages as a remedy "may be inferred," even if not expressly referred to in the statute. *Id.*

Turning to the Indian Mineral Leasing Act, the *Navajo Nation* Court ruled, "[t]he IMLA simply requires Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective and [further] authorizes the Secretary generally to promulgate regulations governing mining operations." *Id.* at 507. The statute, by failing to include a federal managerial role, did not establish the "limited trust relationship" needed to support a claim for relief. *Id.* at 507-08.

Further, the Court explained that "imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes." *Id.* at 508. Because "[t]he IMLA

aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties," the congressional purpose would be defeated by "[i]mposing upon the Government a fiduciary duty to oversee the management of allotted lands." *Id.*

In an opinion issued the same day as *Navajo Nation*, the Supreme Court examined the trust doctrine in the context of overseeing the maintenance of buildings on land of the White Mountain Apache Tribe. *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

In 1870, the United States Army established Fort Apache in the White Mountains of east-central Arizona. *White Mountain Apache Tribe v. United States*, 46 Fed. Cl. 20, 22 (1999). In the 1920s, control of the fort was transferred to the Department of the Interior, and part of the property was used as a school. *Id.* In 1960, Congress declared that Fort Apache "be held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose." Pub. L. No. 86-392, 74 Stat. 8, 8 (1960). In 1976, the National Park Service designated Fort Apache as a National Historic Site. *White Mountain Apache Tribe*, 46 Fed. Cl. at 22.

As alleged by the tribe, the Secretary of the Interior exercised the statutory prerogative to use the property, but then allowed Fort Apache to fall into disrepair and failed to perform necessary maintenance. *Id.* The tribe commissioned an engineering assessment of the property. The assessment reported that it would cost roughly $14 million to rehabilitate the property in accordance with standards for historic preservation. *White Mountain Apache Tribe*, 537 U.S. at 469. The tribe brought suit in the Court of Claims arguing that the government had breached its fiduciary duty.

The Supreme Court held there to be an actionable fiduciary relationship. *Id.* at 468. In light of the *Mitchell* cases, the Court concluded that the Fort Apache trust statute "goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach." *Id.* at 474. First, the 1960 Act "expressly defines a fiduciary relationship" by providing that Fort Apache be "held by the United States in trust for the White Mountain Apache Tribe." *Id.* (citing statute). Second, the United States exercised its discretionary authority to make actual use of the property, thus "not merely exercis[ing] daily supervision but . . . enjoy[ing] daily occupation." *Id.* at 475.

Accordingly, the Court held when the government assumes plenary control over assets held in trust, the government likewise assumes an obligation as trustee to preserve those assets, even absent express statutory delineation of duties of management and conservation. *Id.* As the Court observed, "elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *Id.* The Court explained that a trust relationship between the United States and Native Americans alone is not enough to imply a remedy in damages, and thus "a further source of law [is] needed to provide focus for the trust relationship." *Id.* at 477. But "once that focus [is] provided, general trust law [is to be] considered in drawing the inference that Congress intended damages to remedy a breach of obligation." *Id.*

The *Mitchell* cases, *Navajo Nation*, and *White Mountain Apache* together define the state of law with respect to the Indian trust doctrine. These cases stand for the proposition that tribes may successfully bring cases before the Court of Federal Claims seeking money damages based on the government's breach of a fiduciary duty. Hence, the trust doctrine gives rise to a viable Tucker Act claim. *See* George C. Sisk, *Yesterday and Today: Of Indians, Breach of Trust, Money and Sovereign Immunity* 29 Tulsa L. Rev. 313, 317 (2003)

(summarizing these important cases and discussing their inter-play with the Tucker Act and the Indian Tucker Act).

Before the Court decided these cases, tribes and tribal members had to identify specific statutes stating a right to monetary relief from the government. *Id.* at 337. With these four cases, the Court has clarified that the trust relationship itself can establish a right to monetary relief. However, plain-tiffs must go beyond asserting the general trust relationship between tribes and the government, and must allege a specific trust obligation tied to the resource at stake. In *Mitchell II*, the Court recognized that statutes established a pervasive federal regulation over timber resources adequate to demonstrate a trust relationship. In *White Mountain Apache*, the Court held that the federal government's occupation and management of land and buildings established a trust relationship. These cases demonstrate that where statutes and behavior create per-vasive governmental control over a tribal resource, a specific trust relationship and concomitant fiduciary duty are created.

In *Navajo Nation*, the Court examined the Interior Depart-ment's control over mining resources and found no pervasive control. There, the Court held that the statutory framework only established a minor role for the federal government — signing and approving mining leases that were negotiated and managed by the tribes. The Court found it particularly signifi-cant that the statute regarding the leases was designed to keep control of the resource in the hands of the tribe. In the wake of these cases, determining whether there is a trust relation-ship sufficiently detailed to create a viable claim under the Tucker Act requires a tailored inquiry into the resource at stake, the role of the federal agency involved, and the atten-dant statutory structure.

3.  *Housing on the Blackfeet Reservation*

In assessing whether plaintiffs have a potential claim under the tribal trust doctrine, we examine the level of control the

federal government exercises over the tribal asset at issue. Here, the asset is housing. The federal government's pervasive control of housing on the Blackfeet reservation relates directly to the trust obligations the government owed the tribe.

Congress's decision to hold tribal land in trust has the practical result of eliminating the private housing market on tribal land because neither individual members of the tribe nor the tribe itself has an ownership interest that can be used as security. The government's decision to hold tribal land in trust shows Congress' intent to maintain pervasive control over the resource at stake and gives rise to a fiduciary duty in the government-created tribal housing market. However admirable the government's motivations, the decision to take tribal land in trust has had adverse consequences: by holding tribal land in trust and preventing alienation, the federal government foreclosed many options that exist in most private housing markets. In a recent publication, the United States Commission on Civil Rights reported that American Indians have consistently found it difficult to obtain mortgages on their land because the land is held in trust and therefore cannot be used as collateral. *See* United States Comm. on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country at 64, *available at* http://www.usccr.gov/pubs/na0703/na0731.pdf; *see also* H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795.

Similarly, private housing developers have been deterred from entering tribal housing markets because the property cannot be alienated. *Id.* at 64. The federal government exercises pervasive control over tribal land, and in so doing, severely limits the tribe's ability to control its own economic development in the area of housing. In fact, according to one House Report relating to the passage of the Indian Housing Act, HUD's Homeownership Program was the "only reasonable source of housing in many reservations," see H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795, in part because the land was held in trust.

Thus, while the goal of the General Allotment Act was to prevent unwise tribal alienation of the land, the result was to prevent building and improving housing. Restrictions operating on Indian lands prevent developers from entering the private tribal housing market, and leave tribes with no option but to wait for the federal government to provide decent, safe, and sanitary housing.

The government has often undertaken to provide tribal housing as an exercise of its special responsibility to the tribes. Congress has acknowledged federal control over tribal land and the government's attendant obligations. Congress has specifically noted that the federal government's general trust relationship with the tribes creates a responsibility for the federal government to remedy the deplorable housing conditions on reservations. *See* Native American Housing Assistance and Self-Determination Act ("NAHASDA"), 25 U.S.C. § 4101(2)-(5). NAHASDA recognizes that:

> Congress, through treaties, statutes, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take greater responsibility for their own economic condition; . . . [Moreover,] *providing affordable homes in safe and healthy environments is an essential element in the special role of the United States* in helping tribes and their members to improve their housing conditions and socioeconomic status.

25 U.S.C. § 4101(4)-(5) (emphasis added).

As indicated in the findings under NAHASDA, the federal government's duty to remedy tribal housing conditions existed even before NAHASDA — it derives from treaties and the "general course of dealing" with tribes. During the

process of forcing the tribes onto reservations, many tribes were explicitly promised housing in exchange for land cession. *See* Virginia Davis, *A Discovery of Sorts: Reexamining the Origins of the Federal Indian Housing Obligation*, 18 Harv. BlackLetter L.J. 211, 215-23 (2002). Others were promised money to "promote their civilization." *Id.* at 218-19; *see, e.g., White Mountain Apache Tribe v. United States*, 26 Cl.Ct. 446, 465, 466-67 (1992). The Blackfeet Tribe signed such a treaty. The Court of Claims has held that treaty language such as the "requisites to 'promote civilization'" includes housing. *White Mountain Apache*, 26 Cl. Ct. at 466-67. Treaty language and the relationship between the tribes and the federal government demonstrate that the federal government has long promised that it would assist American Indian tribes in providing housing.

When tribal land was taken into trust under the General Allotment Act, it was done to ensure that every Indian could have a "homestead of his own with assistance by the government to build houses and fences, and open farms." *See* Davis, 18 Harv. BlackLetter L.J. at 224 (quoting Comm'r of Indian Affairs, Annual Report iv-v (1885)). Henry Dawes, proponent of the General Allotment Act, stated that housing was a central element of the Act. *Id.* at 224. When the government took the land in trust, it committed itself to play a major role in housing the trust land's occupants.

*Navajo Nation* and *White Mountain Apache* delineate the ends of a continuum along which courts examine the *Mitchell* doctrine. In *White Mountain Apache*, the federal government's involvement was pervasive. The federal government occupied the land, built and maintained structures on the land, and managed the land. Additionally, federal legislation explicitly recognized a trust relationship between the government and the tribe with respect to management of the land. When the federal agency allowed the buildings on the land to fall into dangerous disrepair, the Court held that it had a fiduciary obligation regarding the buildings and the land. The

obligations surrounding the buildings had also been heightened by the National Park Service's designation of the area as a National Historic Site. Thus, the case demonstrates on-site involvement, oversight of the building and management of the structure, funding, and a statutory framework explicitly recognizing the trust relationship.

The present case is similar in several respects. The federal government controlled the design of the houses, set the building standards, approved all the designs and contracts, and provided funding. HUD's control of housing on tribal land and the Homeownership Program was pervasive.

HUD set the "prototype costs" for each locality, and required that the cost of construction and equipment could not exceed the prototype cost by more than ten percent. *See* Department of Housing and Urban Development, Manual 7440.1: Indian Housing Handbook 3-29 (March 1976). These prototype costs were based on the minimum property standards, standards that permitted the use of the wood foundations at issue here. Housing authorities proposed projects within the prototype cost, "carefully consider[ing] costs . . . to be sure that the project is completed at the lowest possible cost." Indian Housing Handbook 3-40. Even then, however, HUD approved the "development cost" allocated for each project. Indian Housing Handbook 3-40; 5-25. Any variation from the minimum property standards had to be HUD-approved. Indian Housing Handbook 5-25. HUD also had final say over design of the houses and the authority to alter tribally proposed designs in any way. The Indian Housing Handbook has a sample of every form, every contract, every checklist to be used from the first step to the last.

Thus, the only autonomy permitted to tribal housing authorities was the right to design a home within the price range set by HUD, a price range based on HUD's minimum property standards. Even then HUD could change the plans. This is hardly "maximum responsibility for project adminis-

tration" promised to the Housing Authority by HUD. *See* HUD Housing Manual 2-1.

The facts of this case confirm that the tribe had little control over how HUD housing would be built. Although the Blackfeet Housing Authority and occupants of the housing vigorously opposed use of wood foundations, it appears that they had no power to control the materials used. Thus, not only was HUD funding the only viable lending option on most tribal property, but it exerted almost total control over how the tribes would use the housing money they received to construct homes on land the government held in trust.

Thus, as with *Mitchell II*, there is pervasive management of a tribally owned resource to the exclusion of control by the tribal landholders. And, unlike *Mitchell I*, the very purpose for which the land was taken in trust — to prevent alienation — caused the injury at issue. Just as in *Mitchell II*, tribes were squeezed out of any role in their own tribal housing market.

The current case contrasts with the minimal federal control at issue in *Navajo Nation*. There, the Interior Department's only role was to approve leases. It did not manage the leases, negotiate the leases, or dictate their terms. The Interior Department did not provide any funding or oversight beyond lease approval. Although the Interior Secretary appeared to have conducted himself improperly by revealing confidential information to the mineral lessee, the Court held that there was no fiduciary duty and no trust asset in connection with the mineral leases. *Navajo Nation* represents minimal involvement, and it stands in sharp contrast to the pervasive regulation of housing on the Blackfeet reservation. The framework in this case is more akin to the system in *White Mountain Apache*.

An important element in both *Navajo Nation* and *White Mountain Apache* (and in the *Mitchell* cases) was the statutory framework regarding the resource in question. In *White*

*Mountain Apache*, statutory language used the word "trust" when acknowledging the obligation the government owed the tribe in relation to management of tribal land. In *Navajo Nation*, the statutory framework gave the tribe management of the resource. In *Mitchell II*, the Court examined several timber management statutes and noted that the statutory framework showed evidence of an intent by the federal government to pervasively control the tribe's timber resources. Based on the importance of statutory framework in a tribal trust analysis, the determining factor in the present analysis lies in the housing statutes that resulted in the construction of the substandard homes.

The homeowners base their trust claims on five statutes: the United States Housing Act of 1937 and 1949, 42 U.S.C. § 1437-1437x; the National Housing Act, 12 U.S.C. §§ 1715l(a), 1738(a); the Indian Housing Act of 1988, 42 U.S.C. § 1437aa-ff; and the Native American Housing and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. §§ 1702-1750.

At the time the houses were constructed for low-income families on the Blackfeet Indian Reservation in the 1970s, there was no specific statutory enactment applicable only to public housing on Indian lands. Federal low-income housing legislation was generally found in the U.S. Housing Act. *See* 42 U.S.C. §§ 1437-1437j (1976). The provisions in the U.S. Housing Act applied to all public housing, including housing on Indian reservations. *See* 42 U.S.C. § 1437a(6)-(7) (1976) (defining "public housing agency" to include entities "authorized" by, among other governmental agencies, "Indian tribes" to "engage in or assist in the development or operation of low-income housing").

Through the Housing Act, Congress appropriated money for low-income housing purposes, *see* 42 U.S.C. § 1437g(c), and authorized and directed the Secretary of HUD to award, or lend, any appropriated funds to eligible grantees, *see* 42

U.S.C. §§ 1437b, 1437c, 1437f, 1437g(a), & 1439(d). Local housing authorities could apply for loans and grants for the "development, acquisition, or operation of low-income housing projects." *See* 42 U.S.C. §§ 1437b, 1437c, 1437d(a), 1437g. Under the Housing Act, HUD could award funding and other benefits to tribal housing authorities. *See, e.g.*, 24 C.F.R. §§ 805.108-805.109 (1976) (relating to Indian housing authorities).

HUD implemented, by regulation, a "Mutual Help Home-ownership Opportunity Program" on Indian lands to help meet the needs of low-income Indian families. The homes currently at issue were built under this regulatory program. Housing authorities could sell public housing to low-income families under "such terms and conditions as [HUD] may determine by regulation." 42 U.S.C. § 1437c(h) (1976). Under the Homeownership Program, an Indian housing authority could apply to HUD for loans to enable the housing authority to develop public housing designed for sale to eligible tribal members. *See* 24 C.F.R. §§ 805.404(a), 805.415, 805.416, 805.421, 805.422 (1976).

In 1988, nearly ten years after the Blackfeet low-income homes were completed, Congress enacted the Indian Housing Act. The Indian Housing Act was specific Indian housing legislation that moved all Indian public housing programs to a separate title of the U.S. Housing Act and provided express statutory authority for the Homeownership Program under 42 U.S.C. § 1437bb (1988). With the subsequent adoption of the NAHASDA in 1996, Congress moved Indian housing programs out of the U.S. Housing Act consolidating the programs under NAHASDA. HUD's involvement with Indian public housing programs is now controlled exclusively by the NAHASDA and its implementing regulations. Housing Authorities receive block grants under the NAHASDA, and HUD administers the grants. *See Solomon v. Interior Reg'l Hous. Auth.*, 313 F.3d 1194, 1195 (2002).

On their face, these statutes only establish a mechanism for lending money to tribal housing authorities. However, a review of the statutory framework and the Homeownership Program reveals a much more pervasive and controlling framework, as detailed above. The Homeownership Program details the requirements for the housing and connected contracts. There is no language indicating that the goal of the Homeownership Program is merely to help Indian tribes in managing their land and resources. The regulations do not defer to tribal authorities or tribal decision making, but instead explicitly detail what the tribal authorities are to do each step of the way. Federal control over the funds and the program is pervasive.

But pervasive control over a tribal housing program is not necessarily the same as federal control over the tribal resource. If the tribe chooses not to participate in this program (and therefore not receive the funding for housing), HUD has no input into the housing contracts, house designs, or materials used. Such a view, however, ignores the overarching housing issue. The federal government undertook, as part of its treaty and general trust relationship, to assist the Blackfeet tribe to acquire decent, safe, and sanitary housing for low-income families. The tribe had little choice but to accept the government housing program. HUD's Homeownership Program was the "only reasonable source of housing in many reservations," *see* H.R. Rep. 100-604, *reprinted in* 1988 U.S.C.C.A.N. 791, 795, and this was the case on the Blackfeet Reservation. Here, the federal government actively undertook to assist the Blackfeet to obtain desperately needed decent, safe, and sanitary housing. Labeling the housing program as simply one of "financing" ignores the fact that private lenders would not finance the construction of homes on reservation land held by the federal government, which actively undertook to assist the Blackfeet to obtain desperately needed decent, safe, and sanitary housing.

Because the government undertook to fulfill its trust responsibility to provide housing for the tribe and did so

through a pervasive regulatory structure, I would hold that the federal government, having undertaken this task, had an obligation to perform it in a manner consistent with its fiduciary duty to the tribe. Based on the facts set forth in the Complaint, I believe that the government breached that duty by requiring the tribes to use substandard, hazardous building materials during the construction of the homes and then refusing to repair or rebuild the homes. Accordingly, I concur in part, dissent in part.